**BANK JULIUS BAER & CO., LTD.,**
Defendant–Counter–Claimant–
Cross–Defendant–Appellant,

v.

**WAXFIELD LTD.,** Defendant–Third-
Party-Plaintiff-Counter-
Claimant-Appellee,

**Arthur Steinberg, as Temporary Receiver of Sagam Capital Management Corp., Sagam Capital LLC, B.B.C.F.D., S.A., and Skilled Investors Inc., Plaintiff–Counter–Defendants,**

**Estate of Yehuda Shiv, Flame Corp., Jeda Corporation, Eclectic Holdings Inc., Sydney Plastic Corp., Menachem Ivcher, Sagiv Shiv, Mina Persyko, Karin Zakrewski, and Urs G. Schwytter, Third–Party–Defendants.**

**Docket No. 04–6668–CV.**

United States Court of Appeals,
Second Circuit.

Argued Aug. 22, 2005.

Decided Sept. 13, 2005.

Bruce E. Coolidge, New York, N.Y. (Christopher J. Meade, Todd C. Zubler, Karen C. Daly, Wilmer Cutler Pickering Hale and Dorr, New York, NY, David S. Smith, Smith Campbell, New York, NY, of counsel), for Defendant–Counter–Claimant–X–Def–Appellant.

Kenneth F. Peshkin, Great Neck, N.Y. (Janice Purvis, Joseph Yerushalmi, Yerushalmi & Associates, Great Neck, NY, of counsel), for Defendant–Third–Party–Plaintiff–Counter–Claimant–Appellee.

Before: MESKILL, SACK and B.D. PARKER, Circuit Judges.

MESKILL, Circuit Judge.

This appeal concerns the interaction between a broad agreement between the parties to arbitrate their disputes and a series of later-enacted agreements that one party asserts vitiate that understanding. Appellant Bank Julius Baer & Co., Ltd. appeals from an interlocutory order of the United States District Court for the Southern District of New York, Hellerstein, *J.*, refusing to stay the cross-claims of appellee Waxfield, Ltd. The district court concluded that merger and forum selection clauses contained in a series of contracts superseded broad agreement-to-arbitrate language in an earlier document. Because we believe, consistent with our general policy of interpreting contracts in favor of arbitration, that those clauses do not alter the scope of the initial arbitration agreement, we vacate and remand.

## I.

This appeal arises out of litigation concerning a complicated scheme to defraud perpetrated by Yehuda Shiv, a private investment advisor. The facts underlying Shiv's case are not particularly relevant; we recapitulate them here only to illustrate where this appeal fits into the larger context.

On September 10, 1997, Waxfield Ltd., a British Virgin Islands corporation wholly owned by Baruch and Neomy Ivcher, opened an account with the Bank by executing two agreements, entitled "Acknowledgments and Agreements—Mediation and Arbitration" and "Acknowledgments and Agreements—Credit and Security Agreement" (referred to as, respectively, the "Arbitration Agreement" and the "Credit Agreement"). Shiv, along with the Ivchers, possessed general power of attorney over Waxfield, and all three allegedly executed these agreements.[1]

On October 20, 1997, Shiv alone (via his power of attorney) executed three Third Party Collateral Deposit Agreements, known as "Pledge Agreements." Together, the Pledge Agreements pledged the assets in the Waxfield account as collateral for loans by the Bank to three entities: Sydney Plastics, Eclectic Holdings, and Sagam Corp.

Allegedly, the Pledge Agreements were fraudulent in that they made no business sense for Waxfield, but rather were part of an ongoing scheme by Shiv, who had an interest in the various Sagam entities. As part of this scheme, Shiv misrepresented the balances of clients' accounts, transferred money between client accounts to conceal his misrepresentations, charged inflated fees based on the misrepresented balances, and transferred client funds to related and unrelated third parties, including Sagam.

In December 2001, the Securities and Exchange Commission (SEC) charged Shiv and Sagam with securities fraud. *See SEC v. Shiv*, 379 F.Supp.2d 609 (S.D.N.Y. 2005). A December 10, 2001, Preliminary Injunction froze Sagam's assets and appointed a receiver, Arthur Steinberg, to identify the funds Shiv misappropriated and to repatriate them to their rightful owners. Shiv ultimately settled the enforcement action, disgorged most of his personal assets, and subsequently pleaded guilty to criminal securities fraud and received a sentence of 15 months. He died in prison.

---

**1.** The Ivchers maintain that they did not sign the Arbitration Agreement or Credit Agreement, and that their signatures on those documents are forgeries. The district court determined that there was sufficient evidence to raise a question of fact, but declined to resolve it.

In March 2004, Steinberg (the Sagam receiver) filed the case below as ancillary to the overall receivership proceedings to recover the assets behind the Sagam accounts. The receiver named the Bank and Waxfield as defendants, alleging that certain liens on and property interests in the Sagam accounts should be avoided on fraudulent conveyance grounds. Waxfield then answered, including filing cross-claims against the Bank for breach of fiduciary duty, fraud, conversion, negligence, and equitable relief, among other things. The kernel of Waxfield's allegations is that the Bank was complicit in Shiv's fraud—a contention with which Steinberg agrees.

The Bank responded to the cross-claims by moving for a stay pending arbitration, citing an agreement to arbitrate contained in the original account-opening documents. By oral decision rendered on November 23, 2004 (and memorialized in a summary opinion dated the same day), the district court denied the Bank's motion, holding that provisions of the Pledge Agreements superseded the arbitration clause.

This appeal followed.

## II.

▮ We have jurisdiction over the Bank's interlocutory appeal pursuant to the Federal Arbitration Act (FAA), 9 U.S.C. § 16. *See CPR (USA) Inc. v. Spray,* 187 F.3d 245, 252 (2d Cir.1999) ("[I]f the application to compel arbitration is 'embedded' in a broader action—an action in which one party or the other seeks some relief other than an order requiring or prohibiting arbitration ... then orders denying arbitration are immediately appealable.") (emphasis omitted). We review *de novo* the district court's decision on arbitrability. *See Gold v. Deutsche Aktiengesellschaft,* 365 F.3d 144, 147 (2d Cir. 2004).

▮ "The [FAA] creates a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *State of N.Y. v. Oneida Indian Nation of N.Y.,* 90 F.3d 58, 61 (2d Cir.1996) (internal quotation marks omitted). The FAA was enacted to promote the enforcement of privately entered agreements to arbitrate "according to their terms." *Mastrobuono v. Shearson Lehman Hutton,* 514 U.S. 52, 54, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) (internal quotation marks omitted). *See also Volt Info. Sciences v. Bd. of Trustees,* 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) ("[The FAA] simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms."). "Through the FAA, Congress has declared a 'strong federal policy favoring arbitration as an alternative means of dispute resolution.'" *Chelsea Square Textiles v. Bombay Dyeing & Mfg. Co., Ltd.,* 189 F.3d 289, 294 (2d Cir.1999) (quoting *Oldroyd v. Elmira Sav. Bank, FSB,* 134 F.3d 72, 76 (2d Cir.1998)). "This bias in favor of arbitration, 'is even stronger in the context of international transactions.'" *Id.* (quoting *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.,* 9 F.3d 1060, 1063 (2d Cir.1993)).

▮ In deciding whether a dispute is arbitrable, we must answer two questions: (1) "whether the parties agreed to arbitrate," and, if so, (2) "whether the scope of [that] agreement encompasses the claims" at issue. *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.,* 117 F.3d 655, 666 (2d Cir.1997). Consistent with the strong federal policy in favor of arbitration, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H.*

*Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

### III.

Applying these principles, we have no trouble concluding that, at least at some point, Waxfield and the Bank agreed to arbitrate all claims. The Arbitration Agreement contains a general obligation by the parties to subject any disagreement between them to mediation, and, failing that, to arbitration:

> Upon the termination of mediation, any unresolved dispute, controversy or claim arising out of or relating to *any business relationship* between [Waxfield] and the Bank, including but not limited to any dispute, controversy or claim with regard to *any agreement*, the breach thereof or any account or transaction [Waxfield has] with the Bank, shall be settled by arbitration ... and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

(emphasis added). The Credit Agreement, executed contemporaneously with the Arbitration Agreement, contains similar language.

These provisions mean that if the Arbitration Agreement is still in force, Waxfield and the Bank must arbitrate the instant dispute. Complications arise from the Pledge Agreements, ratified a month later, which contain language that according to the district court supersedes the just-quoted agreement to arbitrate. Of particular importance are two clauses in the Pledge Agreements, a merger clause and a forum selection clause. The Merger Clause provides:

> This Agreement supersedes all prior agreements and understandings between [Waxfield] and the Bank. It con-

stitutes the entire agreement of the parties.

The Forum Selection Clause provides:

> *Without limiting* the right of the Bank to bring any action or proceeding against [Waxfield] ... *in the courts of other jurisdictions,* [Waxfield] hereby irrevocably submits to the jurisdiction of any New York State or Federal court sitting in New York City, and [Waxfield] hereby irrevocably agrees that any Action *may* be heard and determined in such New York State court or in such Federal court. [Waxfield] hereby irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of *any Action in any jurisdiction.*

(emphasis added). Finally, also relevant is an incorporation clause in the Pledge Agreements that provides:

> Without exception, all the rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided under any other agreement or by law or in equity.

Waxfield argues, and the district court held, that the Merger and Forum Selection Clauses of the Pledge Agreements effectively destroy the agreement to arbitrate, on the theory that the new agreements supersede the old ones and specific ones supersede general ones. The Bank, on the other hand, contends that the Forum Selection and Merger Clauses are complementary to, not destructive of, the agreement to arbitrate. In particular, the Bank argues that the Merger Clause should be read only to apply to the subject matter of the Pledge Agreements, and not to vitiate all prior, unrelated contractual arrangements, and that the Forum Selection Clause merely requires Waxfield to submit to jurisdiction in New York in the event that the Bank brings a claim there. We consider each provision in turn.

## A.

■ Waxfield first argues that the Pledge Agreements' Merger Clause effectively voided the Arbitration Agreement because it "supersedes *all* prior agreements." (emphasis added). We disagree, although we concede that a literal reading of the Clause would lead to that result.

■ *First,* as a legal matter, that is not the way that merger clauses are typically understood. Rather, a merger clause acts only to require full application of the parol evidence rule to the writing in question— here, the Pledge Agreements. *See Albany Sav. Bank, FSB v. Halpin,* 117 F.3d 669, 672 (2d Cir.1997). But "enforcement of the parties' obligations to arbitrate disputes ... does not implicate the parol evidence rule in connection with the [Pledge Agreements] and, hence, is not precluded by the merger clause in that writing." *Primex Int'l Corp. v. Wal–Mart Stores,* 89 N.Y.2d 594, 600, 679 N.E.2d 624, 627, 657 N.Y.S.2d 385, 388 (1997). Indeed, *Primex* was decided in favor of arbitration on almost exactly the same facts as this appeal: there was an agreement to arbitrate that provided that "[a]ny and all disputes arising out of, under or in connection with this Agreement including, without limitation, the validity, interpretation, performance and breach thereof shall be settled by arbitration," and a later agreement that contained a merger clause that provided that "[a]ll prior discussions, agreements, understandings or arrangements, whether oral or written, are merged herein and this document represents the entire understanding between the parties." *Id.* at 596–97, 657 N.Y.S.2d 385, 679 N.E.2d 624 (first alteration in original) (emphasis omitted). Still, the New York Court of Appeals found that the later-enacted merger clause did not destroy the earlier agreement to arbitrate.

*Id.* at 599, 657 N.Y.S.2d 385, 679 N.E.2d 624.

*Second,* as a textual matter, the reading of the Merger Clause suggested by Waxfield is at odds with the Pledge Agreements' Incorporation Clause, which provides that "[w]ithout exception, all the rights and remedies provided in this Agreement are *cumulative* and not exclusive of any rights or remedies provided under *any other agreement* or by law or in equity." (emphasis added). It makes little sense to read the Merger Clause as destroying previous contractual relationships, when the Incorporation Clause specifically says that the Pledge Agreement is cumulative of other agreements. Were the court to read the Merger Clause in the way urged by Waxfield, the Incorporation Clause would have no meaning—a result forbidden by ordinary precepts of contract interpretation. *See, e.g., Manley v. Ambase Corp.,* 337 F.3d 237, 250 (2d Cir.2003). It would also lead to absurd results, such as expunging the account-opening agreements on which the Pledge Agreements later rely—a result also forbidden by canons of construction. *See, e.g., World Trade Center Properties, L.L.C. v. Hartford Fire Ins. Co.,* 345 F.3d 154, 184 (2d Cir.2003).

In light of these textual and legal considerations, we will not construe the Merger Clause to repudiate all prior agreements between the parties. Rather, and consistent with New York law, we read the Merger Clause as providing that the Pledge Agreements supersede any previous agreements only to the extent that they conflict.

## B.

■ We turn next to the Forum Selection Clause. Waxfield argues that by admitting the possibility of litigation in court, the Forum Selection Clause constitutes a

waiver of the agreement to arbitrate. Here, too, we disagree.

Under our cases, if there is a reading of the various agreements that permits the Arbitration Clause to remain in effect, we must choose it: "[T]he existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *WorldCrisa Corp. v. Armstrong,* 129 F.3d 71, 74 (2d Cir.1997) (internal quotation marks omitted). Moreover, we "cannot nullify an arbitration clause unless the forum selection clause specifically precludes arbitration." *Personal Sec. & Safety Systems v. Motorola,* 297 F.3d 388, 396 n. 11 (5th Cir.2002). In the circumstances presented to us in this appeal, we cannot say that the Forum Selection Clause, which does not even mention arbitration, either "specifically precludes" arbitration or contains a "positive assurance" that this dispute is not governed by the Arbitration Agreement.

The Third Circuit decided a very similar case in *Patten Securities Corp. v. Diamond Greyhound & Genetics,* 819 F.2d 400 (3d Cir.1987), *abrogated on other grounds, Gulfstream Aerospace Corp. v. Mayacamas Corp.,* 485 U.S. 271, 287, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988). There, as here, the court was confronted with a broad agreement to arbitrate and a later-executed agreement that contained a forum selection clause which provided that

> "[t]his Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New Jersey, and the Company hereby consents and will submit to the jurisdiction of the courts of the State of New Jersey and of any federal court sitting in the State of New Jersey with respect to controversies arising under this Agreement."

*Id.* at 407 n. 3. The court explained:

> Conspicuously absent from the forum selection clause in the underwriting agreement is any reference to arbitration whatsoever. When Patten drafted the forum selection clause it could have made a reference to arbitration in the clause if it sought to have Diamond waive NASD arbitration by signing the Underwriting Agreement. A party signing a waiver must know what rights it is waiving. By agreeing to submit to the jurisdiction of the State and Federal Courts of New Jersey, Diamond knew it was waiving its right to attack the maintenance of personal jurisdiction over it by the New Jersey courts or to resort to courts elsewhere. It cannot be said that Diamond also knew that it was waiving its right to the contractual remedy of arbitration, since any reference thereto is absent. *The clause is therefore at least ambiguous.* It makes no reference to NASD arbitration and merely states the agreement of both parties to accept the maintenance of personal jurisdiction by New Jersey courts should Patten bring suit there to settle a controversy arising under the agreement.
>
> Furthermore there is nothing inconsistent between the arbitration obligation and the instant forum selection clause. Both can be given effect, for arbitration awards are not self enforceable. They may only be enforced by subsequent judicial action. Thus, even if arbitration is completed, the forum selection clause would appear to dictate the location of any action to enforce the award.

*Id.* at 407 (citation and footnote omitted) (emphasis added). The same reasoning can—and in our view, should—be employed here. The Forum Selection Clause can be understood, as the Third Circuit

did, as complementary to an agreement to arbitrate. The Forum Selection Clause merely requires Waxfield to submit to suit in the courts of New York. It may be read, consistent with the Arbitration Agreement, in such a way that the Bank and Waxfield are required to arbitrate their disputes, but that to the extent the Bank files a suit in court in New York—for example, to enforce an arbitral award, or to challenge the validity or application of the arbitration agreement—Waxfield will not challenge either jurisdiction or venue. In addition, the Forum Selection Clause makes no reference to arbitration, and so is at least ambiguous. That being so, "[d]oubts [about arbitrability] should be resolved in favor of coverage." *WorldCrisa Corp.*, 129 F.3d at 74 (internal quotation marks omitted).

## IV.

For the reasons just given, we conclude that neither the Merger Clause nor the Forum Selection Clause contained in the Pledge Agreements vitiates the Arbitration Agreement. That being so, this dispute plainly falls within the scope of the parties' agreement to arbitrate. We therefore vacate the judgment of the district court and remand the case for further proceedings. On remand, however, the district court should explore Waxfield's claims that the Ivchers never actually executed the Arbitration Agreement. If they did not, then the Arbitration Agreement obviously does not bind them and their cross-claims can proceed in federal court; if they did, then their cross-claims should be stayed in favor of arbitration.