10-1204-cv (L)
SEC v. Rosenthal

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2010

(Argued: March 18, 2011        Decided: June 9, 2011)

Docket Nos. 10-1204-cv (L); 10-1253 (con)

_____

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

—v.—

ZVI ROSENTHAL, AMIR ROSENTHAL, AYAL ROSENTHAL, OREN ROSENTHAL, EFRAT ROSENTHAL, RIVKA ROSENTHAL,

*Defendants-Appellants*,

ARAGON CAPITAL MANAGEMENT, LLC, ARAGON PARTNERS, LP, NOGA DELSHAD,

*Defendants*.

_____

Before: SACK, KATZMANN, and CHIN, *Circuit Judges*.

Appeal from the judgment of the United States District Court for the Southern District of New York (Maas, *Mag. J.*), entered on February 1, 2010, granting partial summary judgment to the Securities and Exchange Commission. We hold that civil monetary penalties for insider trading are not available under section 21(d)(3) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(d)(3). For the reasons stated below and in the accompanying summary order, the judgment of the district court is **AFFIRMED** in part and **VACATED** in part.

_____

AMIR ROSENTHAL, *pro se* (Zvi Rosenthal, Otisville, N.Y., Ayal Rosenthal, Tel Aviv-Yafo, Israel, *on the brief*), New York, N.Y., *for Defendants-Appellants Zvi, Amir, and Ayal Rosenthal*.

ROBERT KNUTS, Park & Jensen LLP, New York, N.Y., *for Defendants-Appellants Oren, Efrat, and Rivka Rosenthal*.

TRACEY A. HARDIN, Senior Counsel (David M. Becker, General Counsel; Mark D. Cahn, Deputy General Counsel; Jacob H. Stillman, Solicitor; Randall W. Quinn, Assistant General Counsel, *on the brief*), Securities & Exchange Commission, Washington, D.C., *for Plaintiff-Appellee*.

KATZMANN, *Circuit Judge*:

Defendants-Appellants Amir and Ayal Rosenthal ("Amir" and "Ayal"; collectively "defendants") appeal from the judgment of the United States District Court for the Southern District of New York (Maas, *Mag. J.*), entered on February 1, 2010, granting the motion of Plaintiff-Appellee Securities and Exchange Commission ("SEC") for partial summary judgment, ordering disgorgement, granting injunctive relief against Zvi and Amir Rosenthal, and imposing penalties on Zvi, Amir, and Ayal Rosenthal. In this opinion, we consider Amir and Ayal's challenge to the imposition of penalties on them pursuant to section 21(d)(3) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u(d)(3), for their insider trading violations.[1] We hold that civil monetary penalties for insider trading are not available under section 21(d)(3) of the Exchange Act. For the reasons stated herein and in the accompanying summary order, the judgment of the district court is **AFFIRMED** in part and **VACATED** in part.

---

[1] In an accompanying summary order, we address and reject the arguments that the district court abused its discretion in (1) ordering disgorgement from Defendants-Appellants Oren, Efrat, and Rivka Rosenthal (collectively, "relief defendants"); (2) ordering the relief defendants to pay prejudgment interest at the Internal Revenue Service's underpayment rate; and (3) imposing civil penalties on Defendants-Appellants Zvi and Amir Rosenthal under section 21A of the Exchange Act.

# BACKGROUND

The following factual recitation, which is not in dispute, is limited to those facts that are necessary to the resolution of the issue addressed in this opinion.

Zvi and Rivka Rosenthal are the parents of Amir, Ayal, Oren, and Efrat Rosenthal. In June 2003, Amir formed Aragon Partners LP ("Aragon"), a limited partnership, to pool and trade funds on behalf of the Rosenthal family members. Amir contemporaneously founded Aragon Capital Management LLC, which he controlled and in the trading account of which he placed all Aragon trades.

In April 2005, in the course of his employment as an accountant at Ernst & Young, David Heyman, a Rosenthal family friend, learned of the proposed acquisition of a public company by a second company that was an Ernst & Young client. Heyman disclosed this proposed transaction to Amir, who sold the target company's "put" options through the Aragon account ("Project AA trades"). Amir, who was at that time an associate at a large law firm, also passed the tip on to his supervisor, who purchased "call" options. The acquisition ultimately did not occur, and Amir's Project AA trades did not result in any profits or permit him to avoid losses.

In May 2005, in the course of his employment as an accountant at PricewaterhouseCoopers ("PwC"), Ayal learned of a proposed merger involving a PwC client as the target. Ayal communicated this confidential information to Amir, who sold the target company's put options through the Aragon account ("Project Victor trades") and tipped his supervisor, who again bought call options. Ayal later informed Amir that the merger would not occur, and Amir liquidated Aragon's position. Neither Ayal nor Amir generated profits or avoided losses from the Project Victor trades.

On February 8, 2007, Amir, Ayal, and Heyman pleaded guilty to a one-count criminal information alleging that they had conspired to commit securities fraud. Amir admitted to trading on material, nonpublic information and to tipping others. Heyman and Ayal also admitted to tipping Amir.

The SEC instituted this civil enforcement action in February 2007 and filed an amended complaint on March 22, 2007, which alleged that, *inter alia*, Amir, Ayal, and Heyman violated section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and section 17(a) of the Securities Act of 1933 by engaging in insider trading. The parties consented to proceeding before Magistrate Judge Frank Maas. On October 1, 2008, the SEC moved for partial summary judgment on the basis of the guilty pleas in the criminal case. On November 24, 2009, the district court granted summary judgment against Amir and Ayal with respect to the Project Victor trades and against Amir with respect to the Project AA trades and imposed "third tier" civil penalties[2] in connection with those trades pursuant to section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3). The court imposed the statutory maximum penalty of $600,000 on Amir for his five violations — trading on one tip from Heyman and two tips from Ayal and twice tipping his law firm supervisor — and imposed a penalty of $120,000 on Ayal for his two tips to Amir. *See* 15 U.S.C. § 78u(d)(3)(B)(iii); 17 C.F.R. § 201.1002.

## DISCUSSION

We review *de novo* the district court's interpretation of a federal statute. *See, e.g.*, *United States v. Fuller*, 627 F.3d 499, 503 (2d Cir. 2010).

Amir and Ayal challenge the district court's imposition of penalties pursuant to section

---

[2] Section 21(d)(3)(B) lays out a three-tier system of statutory maximum penalties based on certain characteristics of the offense, with larger penalties available at each successive tier. *See* 15 U.S.C. § 78u(d)(3)(B).

21(d)(3) of the Exchange Act, which provides in pertinent part:

> Whenever it shall appear to the Commission that any person has violated any provision of this chapter, [or] the rules or regulations thereunder, . . . *other than by committing a violation subject to a penalty pursuant to section 78u-1 of this title*, the Commission may bring an action in a United States district court to seek, and the court shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation.

15 U.S.C. § 78u(d)(3)(A) (emphasis added).

The instant appeal centers on the meaning of the italicized language set forth above, which refers to a provision enacted as part of the Insider Trading and Securities Fraud Enforcement Act of 1988 ("ITSFEA"), Pub. L. No. 100-704, 102 Stat. 4677. The ITSFEA, *inter alia*, amended the Exchange Act to add section 21A, which was codified at section 78u-1 of Title 15. The parties dispute whether Amir and Ayal committed a violation that was "subject to a penalty pursuant to [section 21A]." To resolve this question, we first look to the text of section 21A and its role in the statutory scheme. *See United States v. Farhane*, 634 F.3d 127, 142 (2d Cir. 2011).

Subsection (a)(1) of section 21A authorizes the SEC to seek, and the district court to impose, a civil penalty for insider trading — *i.e.*, for "purchasing or selling a security . . . while in possession of material, nonpublic information in, or . . . communicating such information in connection with, a transaction . . . ." 15 U.S.C. § 78u-1(a)(1). In a separate subsection, section 21A provides that the amount of such a penalty "shall be determined by the court in light of the facts and circumstances," and "shall not exceed three times the profit gained or loss avoided as a result of such unlawful purchase, sale, or communication." *Id.* § 78u-1(a)(2).

For the reasons discussed below, we conclude that the statutory language is ambiguous. After examining the textual context and legislative history of section 21(d)(3), we hold that a defendant is "subject to" a penalty under section 21A as soon as he engages in insider trading,

regardless of whether this activity ultimately ripens into profits or permits the avoidance of losses.

Here, as noted, Ayal's and Amir's insider trading violations in connection with the Project Victor and Project AA trades did not result in a profit or avoid a loss. Therefore, they cannot be required to pay a financial penalty by the terms of section 21A(a)(2). For this reason, the SEC contends that the defendants' violations were not "subject to a penalty pursuant to section [21A]," thus permitting the district court to impose penalties pursuant to section 21(d)(3). The SEC contends that "subject to" in this context means that a defendant is only exempted from section 21(d)(3) penalties if he is "liable" for a penalty under section 21A — in other words, according to the SEC, a defendant is not "subject to" section 21A penalties unless he ultimately profits or avoids a loss as a result of his insider trading.[3] Br. for the SEC at 27.

---

[3] In support of its position, the SEC relies on *Auer v. Robbins*, 519 U.S. 452 (1997), which involved the Secretary of Labor's interpretation of a regulation implementing the statutory exemption from overtime pay requirements for certain "executive, administrative, [and] professional employees" who were paid on a "salary basis." 519 U.S. at 454 (quoting 29 U.S.C. § 213(a)(1)). The Secretary's regulations defined the term "salary basis" as requiring, *inter alia*, that the employee's compensation not be "*subject to* reduction because of variations in the quality or quantity of the work performed." *Id.* at 455 (quoting 29 C.F.R. § 541.118(a) (1996)) (emphasis added). The Secretary interpreted this regulation to deny exempt status where a salaried employee was subject to a disciplinary policy that actually made pay deductions or "create[d] a 'significant likelihood' of such deductions." *Id.* at 461. The Supreme Court upheld the Secretary's interpretation as not plainly erroneous or inconsistent with the regulation, citing a dictionary definition that "subject to" means "[e]xposed; liable; prone; [or] disposed." *Id.* (first alteration in original) (quoting Webster's New International Dictionary 2509 (2d ed. 1950)) (internal quotation marks omitted).

Here, the SEC appears to have focused on the definition of "liable" in the sense of being "bound or obligated according to law or equity," Webster's Third New International Dictionary 1302 (2002), arguing that Amir and Ayal are not "liable" because "no penalty can be awarded" under section 21A in this case. Br. of the SEC at 27. However, we are not persuaded that the SEC's narrow interpretation of "subject to" is warranted. Taken in the context of the list in which it appears in the Supreme Court's opinion, "liable" suggests to us that the Supreme Court in *Auer* interpreted "subject to" to mean liable in the sense of "being in a position to incur." Webster's, *supra*, at 1302. Committing an insider trading violation puts the violator in a position to incur a section 21A penalty, regardless of the potential amount of such a penalty or whether

-6-

Although in some circumstances an agency's interpretation of a statute that it administers is entitled to substantial deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), the *Chevron* framework is inapplicable where, as here, the agency's interpretation is presented in the course of litigation and has not been "articulated before in a rule or regulation." *Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 239 (2d Cir. 2006). While "a position adopted in the course of litigation lacks the indicia of expertise, regularity, rigorous consideration, and public scrutiny that justify *Chevron* deference," such an interpretation should still "be followed to the extent persuasive." *Catskill Mountain Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 491 (2d Cir. 2001); *see also Lockheed Martin Corp. v. Morganti*, 412 F.3d 407, 411 (2d Cir. 2005) ("[A]gency interpretations presented in litigation may still be given deference so long as they are not post hoc rationalizations of past agency action or otherwise do not reflect the agency's fair and considered judgment.").

In light of these principles, we decline to defer to the SEC's interpretation of section 21(d)(3) because the agency's interpretation does not persuade us. We do not view the statutory text as compelling the SEC's interpretation that defendants are only "subject to" a penalty if such a penalty "can be awarded" in light of the eventual profitability or loss-avoiding consequences of the insider trading activity. Br. of the SEC at 27. To the contrary, section 21A clearly distinguishes between, on the one hand, the conduct that gives rise to the SEC's authorization to bring a civil action to impose a penalty for an insider trading violation and, on the other, the amount of a penalty that may be imposed for such a violation. As set forth below, the most logical conception of the structure of Section 21A is that a defendant is "subject to" a penalty

such a penalty is, in fact, imposed.

under that section as soon as he engages in insider trading activity that invokes the SEC's authority to bring charges, regardless of whether this activity ultimately ripens into profits or permits the avoidance of losses such that the penalty for the violation can be fixed at a non-zero amount.

Section 21A(a)(1) lays out the conduct for which the SEC may bring an action to seek a penalty, and Amir and Ayal satisfy the requirement that they either purchased or sold securities "while in possession of material, nonpublic information" or "communicat[ed] such information in connection with" such a transaction. 15 U.S.C. § 78u-1(a)(1). Accordingly, the district court had "jurisdiction to impose" a section 21A penalty. *Id.* § 78u-1(a)(1)(A). However, subsection (a)(2) caps the amount of the penalty at a maximum of three times the profit or loss avoided as determined "by the court in light of the facts and circumstances." *Id.* § 78u-1(a)(2). Therefore, it may be said that Amir and Ayal were "exposed" to the possibility of a penalty, *see Auer v. Robbins*, 519 U.S. 452, 461 (1997)*,* as soon as they made a purchase or sale based on material nonpublic information (or communicated that information), although the maximum amount of that penalty cannot be known until the profitability of the violation is determined by the court based on developments subsequent to the time of the purchase, sale, or communication that invoked the SEC's civil penalty authority. *See, e.g.*, *SEC v. Patel*, 61 F.3d 137, 140 (2d Cir. 1995) (holding that in order to determine the amount of profits acquired or losses avoided as a result of illegal insider trading, it is necessary "to examine the movement of a stock's price after the relevant information is made public"). Under this reading, the fact that the contemplated mergers never came to fruition relates to the determination of the amount of penalty pursuant to subsection (a)(2), but does not affect the exposure to potential liability at the time of the violation, which is what made the defendants "subject to" section 21A penalties. In the instant

case, defendants' exposure was subsequently determined to be statutorily capped at zero. Although eligibility for a penalty of zero has the same practical result as the SEC's position that defendants are ineligible for a penalty — no money may be collected from defendants in either case — the former construction of section 21A clearly takes Amir's and Ayal's violations outside of the reach of section 21(d)(3).

However, because the statutory language does not necessarily preclude the SEC's interpretation, we find the text ambiguous such that we look to the legislative history of the "subject to" language appearing in section 21(d)(3). *See SEC v. Dorozhko*, 574 F.3d 42, 46 (2d Cir. 2009). The history of section 21(d)(3) unquestionably supports our conclusion that penalties for insider trading are not available under that section for the violations discussed herein.

Section 21(d)(3)'s origin can be traced to the ITSFEA, which added section 21A to the Exchange Act. Section 3(c) of the ITSFEA directed the SEC to submit to Congress "any recommendations the Commission considers appropriate with respect to the extension of the Commission's authority to seek civil penalties . . . *for violations other than those described in section 21A*." 102 Stat. at 4680 (emphasis added); *see also* S. Rep. No. 101-337, at 4 (1990), 1990 WL 263550, at *4. The SEC's submission was followed by the introduction in the Senate of S. 647, which ultimately became the Securities Enforcement Remedies and Penny Stock Reform Act of 1990 ("Remedies Act"), Pub. L. No. 101-429, 104 Stat. 931, the law that enacted section 21(d)(3). *See* S. Rep. No. 101-337, at 4-8, 1990 WL 263550, at *4-8. Section 21(d)(3) thus has its origin in the same law that created section 21A, and this history suggests that Congress, cognizant of the reach of section 21A, intended the amendment that became section 21(d)(3) to fill a gap in the SEC's enforcement powers by addressing violations other than those "described in" section 21A.

This understanding is reinforced by the congressional reports and floor debate. The Senate Report, under the heading "Purpose and Summary," notes that "[w]hile the SEC has sought, and Congress has enacted, additional remedies to assist the SEC in combating insider trading and related violations, broader remedies are needed to address a wider range of securities law violations." *Id.* at 2. The report on a similar bill in the House of Representatives, H.R. 975, reflects the same "need[] to provide financial disincentives to securities law violations *other than insider trading.*" H.R. Rep. 101-616, at 17 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1379, 1384 (emphasis added). "Because many of the charges in the most prominent securities fraud cases of the 1980's . . . involved violations other than insider trading, the Commission believe[d] that it need[ed] the additional authority contained in this legislation to attack the full range of fraudulent activity in the securities markets." *Id.* "By authorizing money penalties for violations of the federal securities laws other than insider trading, this legislation would greatly increase deterrence . . . ." *Id.*

During the House debate on H.R. 5325, the successor to H.R. 975, Representative Edward J. Markey, who sponsored H.R. 5325, stated:

> [A] key piece[] of H.R. 975 as introduced remain[s:] the authority to impose fines for violations of the securities laws. The SEC is limited under present law in its ability to craft civil remedies which are appropriate to the particular violation of law. For cases *other than those involving insider trading, which has its own statutory directive on fines*, the Commission would now have an effective alternative to the simple slap on the wrist represented by an injunction or the nuclear bomb represented by barring someone from the securities business. The Commission could impose fines for myriad violations including issuance of false or misleading prospectus information, market manipulation in penny stocks, stock parking, and short-selling on a downtick.

136 Cong. Rec. H8533 (daily ed. Oct. 1, 1990) (statement of Rep. Markey) (emphasis added).

Accordingly, this legislative history reinforces that Congress, including the Representative who introduced the House version of the Remedies Act, intended that section

21(d)(3) would apply to securities law violations "other than" insider trading.[4]

Finally, we reject the SEC's contention that its interpretation of section 21(d)(3) better

avoids "absurd results." Br. of the SEC at 30. It is, to be sure, well-established that "[a] statute

should be interpreted in a way that avoids absurd results." *United States v. Venturella*, 391 F.3d

120, 126 (2d Cir. 2004) (quoting *United States v. Dauray*, 215 F.3d 257, 264 (2d Cir. 2000))

(internal quotation marks omitted); *accord Bank Julius Baer & Co. v. Waxfield Ltd.*, 424 F.3d

278, 283 (2d Cir. 2005) (noting that an interpretation that "lead[s] to absurd results" is

"forbidden by canons of construction"). Although the SEC is correct that the interpretation that

we now adopt results in defendants' escaping a monetary penalty for their unprofitable insider

trading, we think, as discussed below, that it is the SEC's interpretation that can lead to absurd

results. Moreover, this Court's interpretation does not prevent the SEC or the Department of

Justice from pursuing substantial enforcement actions pursuant to other statutory authority, as

they in fact did in this case.[5]

However undesirable precluding civil penalties for these violations may appear at first

glance, the text of section 21A clearly evinces congressional intent to make the amount of

financial liability to which a violator of the insider trading laws may be exposed directly

proportional to the amount of the profit gained or the loss avoided. *See* 15 U.S.C. § 78u-1(a)(2)

---

[4] The SEC contends, and the district court concluded, that the remedial purpose of the Exchange Act supports the SEC's interpretation of the statute. However, whatever the remedial scope of the Exchange Act in general, the legislative history shows that section 21(d)(3) was not intended to provide remedies for insider trading violations.

[5] Although Amir and Ayal Rosenthal may not face civil monetary penalties for the instances of insider trading here at issue, their violations nonetheless exposed them to incarceration, criminal fines, and, in the case of Amir, an injunction from future violations of the antifraud provisions of the securities laws.

-11-

("The amount of the penalty which may be imposed . . . shall not exceed three times the profit gained or loss avoided as a result of such unlawful purchase, sale, or communication."). The statutory scheme thus anticipates — or, more accurately, requires — that a minimally profitable violation will result in a penalty that is proportionally smaller than the penalty that would be available for a more profitable violation. Thus, we conclude that it would be inconsistent with the statutory scheme, and absurd, to adopt the SEC's interpretation, which would permit a violator who made *no* profit to face a penalty of up to $120,000 per violation, *see* 15 U.S.C. § 78u(d)(3)(B)(iii); 17 C.F.R. § 201.1002, while a violator who profited by $1000 would be exposed to a penalty of no more than $3000. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 290 (2d Cir. 2002) ("[W]e must 'construct an interpretation that comports with [the statute's] primary purpose and does not lead to anomalous or unreasonable results.'" (second alteration in original) (quoting *Connecticut v. U.S. Dep't of the Interior*, 228 F.3d 82, 89 (2d Cir. 2000))).

## CONCLUSION

Accordingly, we conclude that the civil penalties imposed on Amir and Ayal Rosenthal pursuant to section 21(d)(3) must be vacated. For the foregoing reasons and the reasons stated in the companion summary order, the judgment of the district court is hereby **AFFIRMED** in part and **VACATED** in part.