MURDOCK, Justice.
Morgan Keegan & Company, Inc. (“Morgan Keegan”), and Regions Bank (hereinafter referred to collectively as “Regions”) appeal from an order of the Baldwin Circuit Court granting in part and denying in part their motions to compel arbitration in an action filed against them by Baldwin County Sewer Service, LLC (“BCSS”). We reverse the trial court’s order.

I. Facts & Procedural History

According to the allegations made by BCSS in its complaint, in 2001 BCSS began discussing with AmSouth Bank (“Am-South”), the predecessor-in-interest to Regions Bank, options to finance its existing debt. AmSouth recommended that BCSS finance its debt through variable-rate demand notes (‘VRDNs”).[1] As Regions explains in its appellate brief:
“VRDNs are bonds with interest rates that reset on a periodic basis, generally weekly, as in this case. VRDN holders have a right to liquidate their security for par through a put or tender feature. A dealer, called a Remarketing Agent, resells the VRDNs tendered for purchase to new investors. The Remarket-ing Agent also determines the interest rates paid by the VRDN issuer after each reset by setting the new interest rate at the lowest rate for which the VRDNs can still be resold at par, taking into account relevant marketing conditions and credit rating factors.”
Regions’ brief, pp. 5-6.
BCSS agreed to finance its debt through the issuance of VRDNs, and on March 15, 2002, BCSS issued its first series of VRDNs in the amount of $6.2 million. The VRDNs were secured by a letter of credit from AmSouth; a credit agreement attached to the letter of credit contained the terms governing the VRDN transaction. AmSouth also served as the remark-eting agent for the VRDNs. On October 1, 2008, and on May 1, 2005, BCSS issued two additional series of VRDNs for $4.875 million and $14.2 million, respectively, that *385 were structured in the same fashion as the 2002 transaction.
BOSS alleges that in 2005, after the issuance of the third series of VRDNs, AmSouth advised BOSS to execute a so-called interest-rate-swap transaction that would allow BOSS to pay a fixed rate of interest on the 2002, 2003, and 2005 VRDNs rather than to continue to be exposed to the variable interest rates on those bonds. As Regions explains in its appellate brief:
“A swap can cover all or part of the principal of an issuer’s bonds and synthetically fix all or part of the variable interest rate exposure. Under the terms of a swap, the issuer agrees to pay the swap provider a Fixed Rate in exchange for the swap provider paying a Floating Rate on some or all of the underlying debt.”
Regions’ brief, p. 13 (footnotes omitted).
On May 24, 2005, BOSS and AmSouth entered into an International Swap Dealers Association[2] Master Agreement (“the ISDA master agreement”) based on a “notional” amount of $20,085 million — the total of the remaining debt financed by the 2002, 2003, and 2005 VRDNs. BOSS alleges that AmSouth represented to BOSS that the ISDA master agreement would have the effect of fixing BCSS’s interest rate on the remaining debt of $20,085 million.
In 2006, AmSouth merged with Regions Bank, and BOSS continued it relationship with Regions Bank. On June 28, 2007, BOSS issued another series of VRDNs in the amount of $17.3 million that were secured through a letter of credit from Regions Bank to which was attached a credit agreement that was substantially the same as the previous credit agreements between BOSS and AmSouth. Morgan Keegan served as the remarketing agent for the 2007 series of VRDNs.
Subsequently, BOSS entered into an interest-rate swap with Regions Bank that consisted of two transactions dated August 17, 2007, and August 21, 2007, for the total amount financed through the issuance of the 2007 series of VRDNs. The 2007 interest-rate-swap agreements that memorialized those transactions incorporated the ISDA master agreement, changing only a schedule that contained additional contract terms. BOSS alleges that Regions represented to BOSS that the 2007 swap agreement would have the effect of fixing BCSS’s interest rate on the $17.3 million debt.
In its complaint, BCSS alleges that in late 2008 it received a notice of a substantial increase in the variable interest rates on its 2002, 2003, 2005, and 2007 VRDNs, which constituted BCSS’s first notice that the interest-rate-swap agreements recommended by Regions did not fix the interest rate on the VRDNs but, instead, exposed BCSS to “an entirely new increased level of market risk in the highly complex derivative market.”
The credit agreement associated with the 2007 series of VRDNs (“the 2007 credit agreement”) contains an arbitration clause, which states, in pertinent part:
“(a) Any controversy, claim or dispute or issue related to or arising from (A) the interpretation, negotiation, execution, assignment, administration, repayment, modification, or extension of this Agreement or any Financing Document; (B) any charge or cost incurred under *386 this Agreement or any Financing Document; (C) the collection of any amounts due under this Agreement or any assignment thereof; (D) any alleged tort related to or arising out of this Agreement or any Financing Document; or (E) any breach of any provision of this Agreement or any Financing Document, shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association.”
The credit agreements for the 2003 and 2005 series of VRDNs contain substantively identical arbitration clauses that likewise refer to “any Financing Document.” The arbitration clause in the credit agreement for the 2002 series of VRDNs provides:
“(a) Any controversy or claim between or among the parties hereto including but not limited to those arising out of or relating to this instrument, agreement or document or any related instruments, agreements or documents, including any claim based on or arising from an alleged tort, shall be determined by binding arbitration in accordance with the Federal Arbitration Act (or if not applicable, the applicable state law), the Commercial Arbitration Rules, and the ‘Special Rules’ set forth below. In the event of any inconsistency, the Special Rules shall control. Judgment upon any arbitration award may be entered in any court having jurisdiction. Any party to this Agreement may bring an action, including a summary or expedited proceeding, to compel arbitration of any controversy or claim to which this Agreement applies in any court having jurisdiction over such action.”[3]
The 2007 credit agreement defines “Financing Documents” as
“the Series 2007 Notes, the 2007 indenture, the 2007 Letter of Credit, this Agreement, the Guaranty Agreements, and Future Security Documents and/or any other writing delivered at any time by any Financing Participant to the Bank relating to the 2007 Letter of Credit or any Hedge Agreement, or to evidence or secure any of the Obligation.”
(Emphasis added.) The credit agreements for the 2002, 2003, and 2005 series of VRDNs contain identical or substantively identical definitions of the term “Financing Documents,” all including the same reference to “any Hedge Agreement.”
The 2007 credit agreement defines a “Hedge Agreement” as
“any agreement between the Account Party and the Bank now existing or hereafter entered into, which provides for an interest rate or commodity swap, cap, floor, collar, forward foreign exchange transaction, currency swap, cross-currency rate swap, currency option, or any combination of, or option with respect to, these or similar transactions, for the purpose of hedging the Account Party’s exposure to fluctuar- *387 tions in interest rates, currency valuations or commodity prices.”
(Emphasis added.) The other credit agreements contain identical definitions of the term “Hedge Agreement.”
The ISDA master agreement contains a section entitled “Governing Law” that provides that “[tjhis Agreement will be governed by and construed in accordance with the law specified in the Schedule.” The schedules attached to the ISDA master agreement in 2005 and 2007 provide that “[t]his Agreement will be governed by and construed in accordance with the laws of the State of New York without reference to choice of law doctrine.”
The ISDA master agreement also contains a clause entitled “Jurisdiction” that provides:
“(b) Jurisdiction. With respect to any suit, action or proceedings relating to this Agreement (‘proceeding’), each party irrevocably:
“(i) submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and
“(ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.
“Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.”
The schedules attached to the ISDA master agreement contain a provision concerning the “Waiver of Jury Trial,” which provides:
“(d) Waiver of Jury Trial. Each party hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all rights it may have to trial by jury in respect to any proceedings arising out of or relating to this Agreement or any Transaction and acknowledges that it and the other party have been induced to enter into this Agreement by, among other things, these mutual waivers.”
The ISDA master agreement contains a merger clause that provides: “Entire Agreement. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supercedes all oral communication and prior writings with respect thereto.”
The ISDA master agreement also explains the “Events of Default and Termination Events” for the agreement. These include events that constitute a “Credit Support Default”:
“(1) Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure *388 is continuing after any applicable grace period has elapsed;
“(2) the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such part under each Transaction to which such Credit Support Document relates without the written consent of the other party; or “(3) the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document.”
(Emphasis added.) The 2002, 2003, and 2005 credit agreements are included in the list of “Credit Support Documents” in the ISDA master agreement.
On September 29, 2010, BCSS sued Regions Bank and Morgan Keegan in the Baldwin Circuit Court. Among other things, BCSS asserted that Regions falsely represented to BCSS that the ISDA master agreement and the August 2007 swap agreement incorporating the ISDA master agreement fixed BCSS’s interest rates on all the BCSS debt that had been financed through the VRDNs.
Both Regions Bank and Morgan Keegan filed motions to compel arbitration of all claims based on the arbitration clauses in the credit agreements.[4] In response, BCSS contended that its claims concerning the failure of the 2007 swap agreement to provide a fixed interest rate were not subject to arbitration.
Following a hearing on the motions to compel arbitration, the trial court entered an order on August 9, 2011, in which it granted the motions to compel arbitration as to BCSS’s claims concerning the credit agreements but denied the motions to compel arbitration as to BCSS’s claims concerning the failure of the swap transactions to provide a fixed interest rate. The trial court reasoned that the “Jurisdiction” clause in the ISDA master agreement, in combination with its merger clause, “prevented] any argument that the VRDN arbitration agreement applies to disputes concerning the swap agreements” and that those clauses demonstrated that it was “the parties’ intention, as it relates to the interest-swap agreement and any transaction related to that agreement, that the parties would not arbitrate but instead [any dispute] would be resolved by proceedings in a court of competent jurisdiction.” [5]
Regions Bank and Morgan Keegan appealed the trial court’s order pursuant to Rule 4(d), Ala. R.App., P., which permits appeals of a trial court’s order “granting or denying a motion to compel arbitration .... ” Morgan Keegan also filed a separate appeal pursuant to Rule 4(d). This Court consolidated the two appeals for the purpose of writing one opinion.

II. Standard of Review

The parties agree that “[a] direct appeal is the proper procedure by which to seek review of [an order granting or denying a motion to compel arbitration], Rule 4(d), Ala. R.App. P., and this Court reviews the lower court’s order de novo.” *389 Auto Owners Ins., Inc. v. Blackmon Ins. Agency, Inc., 99 So.3d 1193, 1195 (Ala.2012).

III. Analysis

At the outset, we note that the parties agree that this case is to be decided under New York law because of the choice-of-law provision in the ISDA master agreement.
Regions argues that the arbitration clauses in the credit agreements are sufficiently broad in their intended reach to apply to disputes concerning the ISDA master agreement and the 2007 swap agreement. The arbitration clauses in the credit agreements require that “[a]ny controversy, claim or dispute or issue related to or arising from ... the interpretation, negotiation, execution, assignment, administration, repayment, modification, or extension of this Agreement or any Financing Document,” “any alleged tort related to or arising out of this Agreement or any Financing Document,” and “any breach of any provision of this Agreement or any Financing Document” must be arbitrated. In addition, the credit agreements expressly define “Financing Documents” to include “any Hedge Agreement.” The credit agreements likewise define “Hedge Agreement” to include “any agreement between [BOSS] and [Regions Bank] now existing or hereafter entered into, which provides for an interest rate or commodity swap,” and it further explains that such “hedge agreements” are “for the purpose of hedging [B CSS’s] exposure to fluctuations in interest rates.”
BOSS argued to the trial court — and the trial court agreed — that the merger clause in the ISDA master agreement precludes any application to the ISDA agreement of the arbitration clauses in the credit agreements and that the jurisdiction clause in the ISDA agreement evinces an intention by the parties to submit disputes concerning that agreement to a court, for a bench trial. The trial court stated that, “[u]nder New York law, a merger clause prevents the consideration of any other evidence of the parties’ agreement, including an arbitration clause from another agreement.” The trial court cited Jarecki v. Shung Moo Louie, 95 N.Y.2d 665, 722 N.Y.S.2d 784, 745 N.E.2d 1006 (2001), for this proposition.
Jarecki actually states the following with regard to effect of a merger clause:
“The purpose of a merger clause is to require the full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to alter, vary or contradict the terms of the writing (Matter of Primex Inti. Corp. v. Wal-Mart Stores, 89 N.Y.2d 594, 599 [ (1997) ]). The merger clause accomplishes this purpose by evincing the parties’ intent that the agreement ‘is to be considered a completely integrated writing1 (id., at 600).”
95 N.Y.2d at 669, 722 N.Y.S.2d 784, 745 N.E.2d at 1009 (emphasis added).
The trial court apparently understood the explanation in Jarecki to mean that nothing in another contract can affect disputes under the contract containing the merger clause, but this is not the case. In fact, “under New York law, the general language of a merger clause ... is ‘insufficient to establish any intent of the parties to revoke retroactively their contractual obligations to submit disputes arising’ under an earlier agreement to arbitration.” General Motors Corp. v. Fiat S.p.A, 678 F.Supp.2d 141, 148 (S.D.N.Y.2009) (quoting Primex Int’l Corp. v. Wal-Mart Stores, Inc., 89 N.Y.2d 594, 599, 657 N.Y.S.2d 385, 679 N.E.2d 624 (1997)). The reason for this is that “the parties’ obligation to arbitrate disputes arising from the earlier agreements in no way implicate[s] the parol evidence rule.” Id. at *390 149. In Bank Julius Baer & Co., Ltd. v. Waxfield Ltd., 424 F.3d 278, 283 (2d Cir.2005), the United States Court of Appeals for the Second Circuit reached the same conclusion in rejecting an argument almost identical to that made by BCSS:
“Waxfield first argues that the Pledge Agreements’ Merger Clause effectively voided the Arbitration Agreement because it ‘supersedes all prior agreements.’ (emphasis added). We disagree, although we concede that a literal reading of the Clause would lead to that result.
“... [A]s a legal matter, that is not the way that merger clauses are typically understood. Rather, a merger clause acts only to require full application of the parol evidence rule to the writing in question — here, the Pledge Agreements. See Albany Sav. Bank, FSB v. Halpin, 117 F.3d 669, 672 (2d Cir.1997). But ‘enforcement of the parties’ obligations to arbitrate disputes ... does not implicate the parol evidence rule in connection with the [Pledge Agreements] and, hence, is not precluded by the merger clause in that writing.’ Primex Int’l Corp. v. Wal-Mart Stores, 89 N.Y.2d 594, 600, 679 N.E.2d 624, 627, 657 N.Y.S.2d 385, 388 (1997).”
In other words, in this case, although the merger clause in the ISDA master agreement ensures that that contract constitutes the entire agreement as to the interest-rate swaps, it does not have any effect on the terms of the credit agreements, including the scope of the arbitration clauses in those agreements.
Both BCSS and the trial court seek to rely upon MAT Movies & Television Productions GMBH & Co. Project IV KG v. RHI Entertainment Distribution, LLC, 752 F.Supp.2d 373 (S.D.N.Y.2010). The trial court stated that the MAT Movies court “rejected an attempt to impose an arbitration clause from an earlier agreement between the parties because the merger clause in the subsequent agreement which was in dispute prevented the earlier agreement from being merged into the latter.” BCSS claims that MAT Movies demonstrates that the merger clause in the ISDA master agreement prevents application of the arbitration clauses in the credit agreements to disputes involving the ISDA master agreement.
BCSS and the trial court make MAT Movies stand for something broader than it actually stands for, however. The court in MAT Movies was concerned with whether the fact that the later agreement (called “the settlement agreement”) mentioned the earlier agreement (called “the distribution agreement”) meant that the arbitration clause in the distribution agreement applied to disputes concerning the settlement agreement. The MAT Movies court stated generally: “ ‘[A]s is the case in all merger clauses, the reference to ... other documents [including the contract with the arbitration clause] simply assures the continued vitality of those documents and prevents their being merged into the [subsequent] Agreement.’ ” 752 F.Supp.2d at 378 (quoting Rosenblum v. Travelbyus.com Ltd., 299 F.3d 657, 665 (7th Cir.2002)). Specifically, the MAT Movies court explained that “this standard merger clause language prevents the earlier Distribution Agreement from being merged into the later Settlement Agreement and thereby assures that parts of the Distribution Agreement remain in effect....” Id. at 378. In this case, the arbitration clause in the credit agreements is worded broadly enough to cover disputes concerning the ISDA master agreement and the 2007 swap agreement. Indeed, the arbitration clause in the credit agreements expressly references disputes that might arise from future agreements. *391 In contrast, the court in MAT Movies was not concerned with whether an arbitration clause in the earlier distribution agreement provided that its requirement for arbitration of disputes apply to the later settlement agreement.[6]
BOSS also contends that the “Jurisdiction” or forum-selection clause in the ISDA master agreement evinces an intention by the parties to adjudicate disputes concerning that agreement in court rather than submit them to arbitration. The forum-selection clause provides, in pertinent part, that “[w]ith respect to any suit, action or proceedings relating to this Agreement (‘proceeding’) each party irrevocably ... submits ... to the non-exclusive jurisdiction of the courts of the State of New York” and each party “waives any objection which it may have” to venue or jurisdiction “of venue of any Proceedings brought in any such court.” BOSS argues that this clause provides for nonexclusive jurisdiction in the courts of New York over any dispute concerning the ISDA master agreement.
Regions correctly observes, however, that the forum-selection clause in the ISDA master agreement does not preclude arbitration. Courts in New York have rejected the notion that a forum-selection clause containing language similar to the one here precludes the application of an arbitration clause to the agreement in question. In Bank Julius Baer & Co., for example, the United States Court of Appeals for the Second Circuit explained:
“We turn next to the Forum Selection Clause. Waxfield argues that by admitting the possibility of litigation in court, the Forum Selection Clause constitutes a waiver of the agreement to arbitrate. Here, too, we disagree.
“Under our cases, if there is a reading of the various agreements that permits the Arbitration Clause to remain in effect, we must choose it: ‘[T]he existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.’ WorldCrisa Corp. v. Armstrong, 129 F.3d 71, 74 (2d Cir.1997) (internal quotation marks omitted). Moreover, we ‘cannot nullify an arbitration clause unless the forum selection clause specifically precludes arbitration.’ Personal Sec. & Safety Systems v. Motorola, 297 F.3d 388, 396 n. 11 (5th Cir.2002). In the circumstances presented to us in this appeal, we cannot say that the Forum Selection Clause, which does not even mention arbitration, either ‘specifically precludes’ arbitration or contains a ‘positive assurance’ that this dispute is not governed by the Arbitration Agreement.”
424 F.3d at 283-84 (emphasis added). The Bank Julius Baer & Co. court further explained how a forum-selection clause and an arbitration clause could be harmonized:
“The Forum Selection Clause can be understood, as the Third Circuit did [in Patten Securities Corp. v. Diamond Greyhound & Genetics, 819 F.2d 400 (3d Cir.1987), abrogated on other grounds, Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 287, 108 S.Ct. *392 1133, 99 L.Ed.2d 296 (1988) ], as complementary to an agreement to arbitrate. The Forum Selection Clause merely requires Waxfield to submit to suit in the courts of New York. It may be read, consistent with the Arbitration Agreement, in such a way that the Bank and Waxfield are required to arbitrate their disputes, but that to the extent the Bank files a suit in court in New York — for example, to enforce an arbitral award, or to challenge the validity or application of the arbitration agreement — Waxfield will not challenge either jurisdiction or venue. In addition, the Forum Selection Clause makes no reference to arbitration, and so is at least ambiguous. That being so, ‘[djoubts [about arbitrability] should be resolved in favor of coverage.’ WorldCrisa Corp., 129 F.3d at 74 (internal quotation marks omitted).”
Id. at 285. In Citigroup Global Markets Inc. v. VCG Special Opportunities Master Fund, Ltd. (No. 08-CV-5520(BSJ), Nov. 12, 2008), note 6 (S.D.N.Y.2008) (not reported in F.Supp.2d), aff'd, 598 F.3d 30 (2d Cir.2010), the court followed this same rationale in a case concerning the “Jurisdiction” clause in an ISDA master agreement. See also Kelso Enters. Ltd. v. A.P. Moller-Maersk A/S, 375 Fed.Appx. 48, 50 (2d Cir.2010) (not reported in F.3d); Chen-Oster v. Goldman, Sachs & Co., 785 F.Supp.2d 394, 402-03 (S.D.N.Y.2011). Applying these authorities, we find that the forum-selection clause in the ISDA master agreement does not override the arbitration clauses in the credit agreements.
Finally, BCSS contends that the clause in the ISDA master agreement waiving a right to trial by jury also demonstrates that the parties to the ISDA master agreement intended to resolve disputes in court rather than in arbitration. The jury waiver provides, in pertinent part, that “[e]ach party hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all rights it may have to trial by jury in respect to any proceedings arising out of or relating to this Agreement....” (Emphasis added.)
As Regions notes, the jury-trial-waiver clause “neither requires litigation nor precludes arbitration.” Regions’ brief, p. 34. Indeed, jury-trial waivers often accompany arbitration provisions in contracts. The language of the jury-trial-waiver clause by itself does not prevent application of the arbitration clauses in the credit agreements to disputes concerning the ISDA master agreement. It simply represents what it states: a waiver by the parties of any possible right to a trial by jury for disputes between the parties.

IV. Conclusion

Regions presented evidence of the existence of a contract requiring arbitration of the disputes at issue. BCSS attempted to demonstrate that the arbitration clauses did not apply to disputes over the ISDA master agreement and the 2007 swap agreement, but its reasoning is not compatible with the text of the arbitration clauses in the credit agreements and is not sufficient to overcome the presumption in favor of arbitrability. Therefore, we reverse the order of the trial court denying the motions to compel arbitration of BCSS’s claims concerning the ISDA master agreement and the 2007 swap agreement and remand the case for proceedings consistent with this opinion.
1101508 — REVERSED AND REMANDED.
1101512 — REVERSED AND REMANDED.
MALONE, C.J., and WOODALL, BOLIN, and MAIN, JJ., concur.

. Regions notes that VRDNs are also known as “variable-rate demand obligations."

. "The International Swap Dealers Association, now known as the International Swap and Derivatives Association, is a global trade association that developed a master agreement for interest rate and currency exchange swaps.” Caiola v. Citibank, N.A., New York, 295 F.3d 312, 317 n. 1 (2d Cir.2002).

. In its motion to compel arbitration, Regions Bank represented that “[e]ach of the Credit Agreements ... contains a virtually identical arbitration agreement” and that "the 2002 provision differs only cosmetically — there is no substantive difference.” In its response to Regions Bank's motion, BCSS did not dispute this assertion, and, in fact, it quoted the language of the arbitration clause in the 2007 credit agreement as representative of the arbitration clauses in “[e]ach of the agreements.” ía its order, the trial court did not note any difference in the wording of the arbitration clauses, and it did not render its decision on that basis. Similarly, on appeal no issue is raised by any of the parties regarding the difference in wording between the arbitration clause in the 2002 credit agreement and the arbitration clauses in the other credit agreements. Thus, for purposes of this appeal, we consider the differences in wording to be inconsequential.

. Morgan Keegan argued in the trial court that it could enforce the arbitration provisions because BCSS’s claims against it are inextricably intertwined with its claims against Regions Bank. BCSS did not dispute this assertion.

. Specifically with respect to Morgan Keegan, the trial court ruled that "Morgan Keegan may arbitrate the claims against it to the same extent Regions [Bank] can compel arbitration." BCSS did not appeal this aspect of the trial court’s order.

. The MAT Movies court readily admitted that "where a claim alleging breach of one contract requires construction of another contract with an arbitration clause or implicates the parties’ rights or obligations under the other contract, that claim may be governed by the other contract’s arbitration clause.” 752 F.Supp.2d at 378. It was just that, in that case, ”[c]onstruction of the Distribution Agreement [wa]s not required to resolve the parties’ dispute” under the later settlement agreement; the parties’ "rights or obligations under the Distribution Agreement [were] not implicated.” Id. at 378-79.