09-0197-cv (L)
Townsend v. Benjamin Enterprises, Inc.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2011

(Argued: August 30, 2011     Decided: May 9, 2012)

Docket Nos. 09-0197-cv(L), 09-4509-cv(XAP)

_____

MARTHA DIANE TOWNSEND,

Plaintiff-Cross-Appellee,

KARLEAN VICTORIA GREY-ALLEN,

Plaintiff-Appellant-Cross-Appellee,

—v.—

BENJAMIN ENTERPRISES, INC., HUGH BENJAMIN, MICHELLE BENJAMIN,

Defendants-Appellees-Cross Appellants.

_____

Before: LIVINGSTON and LOHIER, Circuit Judges, and KOELTL, District Judge.[*]

_____

This is an appeal and cross-appeal from a final judgment of the United States District Court for the Southern District of New York (Yanthis, Magistrate Judge). The parties challenge the

_____

[*] The Honorable John G. Koeltl, of the United States District Court for the Southern District of New York, sitting by designation.

decisions of the district court that granted summary judgment dismissing plaintiff Karlean Victoria Grey-Allen's Title VII retaliation claim; denied the defendants' post-trial motion for judgment as a matter of law or, in the alternative, for a new trial; and awarded plaintiff Martha Diane Townsend $141,308.80 in attorney's fees and costs.

Because we find no error in the district court's decisions, we affirm.

Judge Lohier concurs in a separate opinion.

_____

STEPHEN BERGSTEIN, Bergstein & Ullrich, LLP, Chester, NY, for Plaintiff-Appellant-Cross-Appellee Karlean Victoria Grey-Allen and Plaintiff-Cross-Appellee Martha Diane Townsend.

RICHARD G. KASS, Amy M. Culver, Of Counsel, Bond, Schoeneck & King, PLLC, New York, NY, for Defendants-Appellees-Cross-Appellants Benjamin Enterprises, Inc., Hugh Benjamin, and Michelle Benjamin.

GAIL S. COLEMAN, Attorney, P. David Lopez, General Counsel, Lorraine C. Davis, Acting Associate General Counsel, Carolyn L. Wheeler, Assistant General Counsel, for Amicus Curiae U.S. Equal Employment Opportunity Commission.

MARGARET MCINTYRE, for Amicus Curiae National Employment Lawyers Association, New York.

_____

JOHN G. KOELTL, District Judge:

Among other issues, this appeal requires us to answer two questions of first impression in this Court: first, whether there is a viable claim of retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), for participating in an internal employer investigation prior to any proceeding before the Equal Employment Opportunity Commission ("EEOC"); and, second, whether an employer is liable under Title VII for sexual harassment committed by a senior executive who is a proxy or alter ego for the employer, despite the existence of a possible affirmative defense under the Supreme Court's decisions in Faragher v. City of Boca Raton, 524 U.S. 775 (1998), and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998).

These questions arise in the following context. The plaintiff Martha Diane Townsend was employed by defendant Benjamin Enterprises, Inc. ("BEI"). She alleged that she was sexually harassed by defendant Hugh Benjamin, who was the husband of BEI President Michelle Benjamin, and the sole corporate Vice President of BEI, as well as a shareholder of BEI. Plaintiff Karlean Victoria Grey-Allen, the Human Resources Director ("HR Director") of BEI, began to conduct an

internal investigation of the allegations.  However, before completing the investigation, she was fired by defendant Michelle Benjamin.  Grey-Allen alleged that her termination was in retaliation for her participation in the internal investigation.

Grey-Allen and Townsend sued BEI, Michelle Benjamin, and Hugh Benjamin in the United States District Court for the Southern District of New York for violations of Title VII; New York Human Rights Law, N.Y. Exec. Law § 290 et seq. ("New York Human Rights Law"); and New York State tort law.  The District Court (Yanthis, Magistrate Judge)[1] granted summary judgment dismissing Grey-Allen's retaliation claims, and a jury returned a verdict in favor of Townsend against BEI, Michelle Benjamin, and Hugh Benjamin.  Thereafter, the Magistrate Judge denied the defendants' motion for judgment as a matter of law or, in the alternative, for a new trial, and awarded Townsend attorney's fees and costs.

This is an appeal and a cross-appeal challenging three orders of the Magistrate Judge.

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to have the Magistrate Judge conduct all proceedings including trial.

-4-

First, Grey-Allen challenges the order granting summary judgment dismissing her Title VII retaliation claim.[2] The district court granted summary judgment on the ground that Grey-Allen's participation in an internal employer investigation into Townsend's sexual harassment allegations, an investigation that was not connected to any formal charge with the EEOC, did not qualify as protected activity under the participation clause of Title VII's anti-retaliation provision. Townsend v. Benjamin Enters., Inc., No. 05 Civ. 9378, 2008 WL 1766944 (S.D.N.Y. Apr. 17, 2008).

Second, BEI and the Benjamins challenge the district court's order denying their post-trial motion for judgment as a matter of law or, in the alternative, for a new trial.[3] They contend that the district court erred in rejecting various arguments asserted by the defendants, including their

---

[2] The district court granted summary judgment dismissing Grey-Allen's retaliation claims under both Title VII and the New York Human Rights Law, and noted that "[c]ourts analyze retaliation claims under the New York Human Rights Law in the same manner as Title VII claims." Townsend v. Benjamin Enters., Inc., No. 05 Civ. 9378, 2008 WL 1766944, at *2 & n.3 (S.D.N.Y. Apr. 17, 2008). Grey-Allen did not brief the issue of whether it was error for the district court to grant summary judgment dismissing her New York Human Rights Law retaliation claim and has therefore waived any such argument.

[3] BEI and Michelle Benjamin appeal those portions of the jury verdict that were against them. Hugh Benjamin does not appeal the tort verdict against him.

argument that there is no "proxy" or "alter ego" exception to the Faragher/Ellerth affirmative defense.

Third, BEI and the Benjamins challenge the district court's order awarding Townsend $141,308.80 in attorney's fees and costs. They argue that Townsend was not entitled to fees and costs accrued after the defendants made an Offer of Judgment pursuant to Federal Rule of Civil Procedure 68 because, they assert, the Offer exceeded the sum of Townsend's ultimate recovery and her fees and costs at the time of the Offer. They contend that the district court mistakenly reached a contrary conclusion because it erred in calculating the reasonable hourly rate for an attorney's services by considering the prevailing market rate in the district, rather than the rate stated in Townsend's retainer agreement with her counsel.

Because we find no error in the district court's thoughtful and well-reasoned opinions, we affirm.

## BACKGROUND

### I.

Townsend began working at BEI in June 2002. She held the position of office manager and First Impressions Director, or receptionist. BEI trains disadvantaged or low-skilled individuals to work for local companies. Michelle Benjamin,

the President of BEI, is a co-owner of BEI and has the power to hire and fire employees.  Hugh Benjamin is married to Michelle Benjamin and is the sole corporate Vice President of BEI, as well as a corporate shareholder.  Hugh Benjamin once owned 34% of the corporate shares but owned only 5% of the corporate shares at the time of trial.

Townsend alleged that Hugh Benjamin sexually harassed her from the summer of 2003 through March 2005 by directing sexually offensive comments at her, propositioning her, touching her sexually, and sexually assaulting her.  On March 9, 2005, Townsend told Michelle Benjamin about the harassment. On March 17, 2005, Townsend reported the sexual harassment to Karlean Victoria Grey-Allen, the HR Director of BEI.

**II.**

Grey-Allen began working for BEI as the HR Director in August 2004.  When Townsend reported the sexual harassment to her, Grey-Allen asked Townsend to provide a written and oral account of the events that had occurred.  Grey-Allen also spoke with the New York State Division of Human Rights, which suggested that she interview Hugh Benjamin and then separate him from Townsend.  Grey-Allen then interviewed Hugh Benjamin and asked him to work from home.

On March 21, 2005, Grey-Allen discussed the sexual harassment allegations with Dennis Barnett, a management consultant retained by BEI. Barnett had been assigned to train Grey-Allen when she arrived at BEI, and Grey-Allen described him as a mentor with whom she believed she could share confidential concerns. Michelle Benjamin learned of Grey-Allen's conversation with Barnett and allegedly deemed it inappropriate. Michelle Benjamin terminated Grey-Allen that same day, asserting that Grey-Allen had breached confidentiality by speaking with Barnett.

On March 22, 2005, Michelle Benjamin took over the investigation of Townsend's sexual harassment allegations. She allowed Hugh Benjamin to return to the office. She also retained HR Delivery, Inc. ("HR Delivery"), an outside human resources organization, to conduct the investigation. Grey-Allen contends that the investigation by HR Delivery was inadequate and that Michelle Benjamin controlled how the investigation was conducted and what information HR Delivery was able to access. HR Delivery ultimately concluded that "nothing happened" between Hugh Benjamin and Townsend and that it was a "he said versus she said" case.

On March 23, 2005, Townsend resigned from BEI. She told Michelle Benjamin that she could not "take it in that office" after Hugh Benjamin was permitted to come back to work. In

April 2005, Townsend and Grey-Allen filed a joint complaint with the EEOC. No charge had yet been filed with the EEOC at the time Grey-Allen conducted her investigation or at the time Grey-Allen was terminated.

**III.**

Townsend and Grey-Allen filed their complaint in the Southern District of New York on November 4, 2005. On February 3, 2006, the defendants served Townsend with an Offer of Judgment pursuant to Rule 68 for $50,000, inclusive of all attorney's fees and costs accrued through that time. Townsend rejected that Offer. The defendants did not make an Offer of Judgment to Grey-Allen.

On March 13, 2008, the district court initially denied the defendants' motion for summary judgment that sought to dismiss all claims by Townsend and Grey-Allen. Townsend v. Benjamin Enters., Inc., No. 05 Civ. 9378, 2008 WL 686631 (S.D.N.Y. Mar. 13, 2008). However, on the defendants' motion for reconsideration, the district court granted summary judgment dismissing Grey-Allen's retaliation claims under Title VII and the New York Human Rights Law, holding that, by participating in an internal investigation into Townsend's sexual harassment allegations that was not associated with any EEOC proceeding, Grey-Allen had not engaged in protected

activity under the participation clause of Title VII's anti-retaliation provision.[4]  Townsend, 2008 WL 1766944, at *2.

Townsend's claims proceeded to a jury trial.  On December 12, 2008, the jury returned a verdict in favor of Townsend for $30,400.  The jury found that Hugh Benjamin had subjected Townsend to a hostile work environment and also found that he was the alter ego of BEI and that his actions were therefore imputed to BEI.  The jury also found Hugh Benjamin liable for civil battery.  The jury did not find BEI liable under Title VII for constructive discharge.  The jury award consisted of $5200 against BEI, Michelle Benjamin, and Hugh Benjamin under Title VII and the New York Human Rights Law[5] and $25,200 against Hugh Benjamin under New York tort law.

On October 2, 2009, the district court awarded attorney's fees and costs to Townsend in the amount of $141,308.80.  The district court thereafter denied a motion for reconsideration of this fee award.  Townsend v. Benjamin Enters., Inc., No. 05 Civ. 9378, 2009 WL 3722716 (S.D.N.Y. Nov. 6, 2009).

---

[4] The district court noted that Grey-Allen "concede[d] that she cannot claim protection under the opposition clause [of Title VII] because she lacked a good faith belief that Townsend was sexually harassed."  Townsend, 2008 WL 1766944, at *2.

[5] BEI alone was found liable for violations of Title VII, and Michelle Benjamin, Hugh Benjamin, and BEI were found jointly and severally liable for violations of the New York Human Rights Law.

Grey-Allen filed her notice of appeal on January 12, 2009 and an amended notice of appeal on November 2, 2009. Cross-appellants BEI, Michelle Benjamin, and Hugh Benjamin filed their notice of appeal on October 28, 2009.

**DISCUSSION**

**I.**

A.

Grey-Allen contends that the district court erred in holding that the participation clause of Title VII's anti-retaliation provision does not protect participation in an internal employer investigation not associated with any formal EEOC charge. She argues that the district court thus erred in granting summary judgment dismissing her Title VII retaliation claim on this basis. We review a district court's grant of summary judgment de novo, construing the evidence in the manner most favorable to the non-moving party. See Okin v. Vill. of Cornwall-on-Hudson Police Dep't, 577 F.3d 415, 427 (2d Cir. 2009).

The district court found that Grey-Allen did not engage in protected activity under the participation clause because

> "[i]n order to gain protection under the participation clause, the participation must be in an investigation or proceeding covered by Title VII, and thus not in an internal employer investigation." Correa v. Mana Prods., Inc., [550 F. Supp. 2d 319, 329 (E.D.N.Y. 2008).] Here,

-11-

> it is undisputed that Grey-Allen's investigation was conducted pursuant to her employer's internal procedures; more to the point, Grey-Allen's actions were not associated with any Title VII proceeding.

Townsend, 2008 WL 1766944, at *2. The question of whether the participation clause covers internal investigations not associated with a formal EEOC charge[6] is a question of first impression in this Court.

Section 704(a) of Title VII contains both an opposition clause and a participation clause, making it unlawful for an employer to retaliate against an individual "because he has opposed any practice made an unlawful employment practice by

---

[6] We express no opinion on whether participation in an internal investigation that is begun after a formal charge is filed with the EEOC falls within the scope of the participation clause. Some courts have answered this question in the affirmative. Abbott v. Crown Motor Co., 348 F.3d 537, 543 (6th Cir. 2003) ("[W]e hold that Title VII protects an employee's participation in an employer's internal investigation into allegations of unlawful discrimination where that investigation occurs pursuant to a pending EEOC charge."); Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1353 (11th Cir. 1999) ("[W]e recognize that, at least where an employer conducts its investigation in response to a notice of charge of discrimination, and is thus aware that the evidence gathered in that inquiry will be considered by the EEOC as part of its investigation, the employee's participation is participation 'in any manner' in the EEOC investigation."); see also EEOC v. Total Sys. Servs. Inc., 221 F.3d 1171, 1174 n.3 (11th Cir. 2000) (distinguishing case from Clover on the ground that no EEOC charge had been filed before the alleged retaliatory act). Because the investigation and alleged retaliation at issue here occurred before any charge was filed with the EEOC, we need not reach this question. See Hatmaker v. Mem'l Med. Ctr., 619 F.3d 741, 747 (7th Cir. 2010) (reserving judgment on this question when internal employer investigation had no nexus to pending EEOC charge).

-12-

this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). In the proceedings below, Grey-Allen conceded that she was not covered by the opposition clause, because she did not know whether Townsend's allegations of harassment were true and thus lacked a good-faith belief that the discriminatory action had occurred, which is required for protection under the opposition clause.[7] Townsend, 2008 WL 1766944, at *2. Instead, Grey-Allen asserted that, by conducting an investigation into Townsend's allegations of sexual harassment in her capacity as BEI's HR Director, she engaged in protected activity under the participation clause.

"'As in all statutory construction cases, we begin with the language of the statute.'" United States v. Am. Soc'y. of Composers, Authors & Publishers, 627 F.3d 64, 72 (2d Cir. 2010) (quoting Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002)). Grey-Allen contends that the language "participate[]

---

[7] The district court granted summary judgment before the Supreme Court rendered its decision in Crawford v. Metropolitan Government of Nashville & Davidson County, 555 U.S. 271 (2009), which adopted an expansive interpretation of the opposition clause of Title VII's anti-retaliation provision. Counsel for Grey-Allen contended at oral argument that Grey-Allen would have been protected by the opposition clause had the proceedings occurred after Crawford and had she relied on the opposition clause. (Oral Arg. Tr., Aug. 30, 2011 ("Tr."), at 9-10.)

in any manner in an investigation, proceeding, or hearing under this subchapter," 42 U.S.C. § 2000e-3(a), encompasses participation in any proceeding intended to remedy employment discrimination under Title VII, including internal sexual harassment investigations not connected with any formal EEOC proceeding or charge. We decline to adopt such a strained interpretation of the language of the statute.

The language of the participation clause confines those proceedings in which participation is protected to those "under this subchapter," meaning subchapter VI of Chapter 21 of Title 42. 42 U.S.C. §§ 2000e—2000e-17. Much of this subchapter is devoted to describing the enforcement powers of the EEOC and the procedures by which the EEOC carries out its investigations and hearings. See, e.g., 42 U.S.C. §§ 2000e-5, 2000e-8, 2000e-9. An "investigation . . . under this subchapter" thus plainly refers to an investigation that "occur[s] in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC." Total Sys. Servs, 221 F.3d at 1174.

Every Court of Appeals to have considered this issue squarely has held that participation in an internal employer investigation not connected with a formal EEOC proceeding does

not qualify as protected activity under the participation clause.  See Hatmaker, 619 F.3d at 746-47; Total Sys. Servs, 221 F.3d at 1174; Vasconcelos v. Meese, 907 F.2d 111, 113 (9th Cir. 1990).  The Courts of Appeals for the Fifth and Sixth Circuits have also suggested that, for conduct to be protected by the participation clause, it must occur in connection with a formal EEOC proceeding.  See Abbott, 348 F.3d at 543; Byers v. Dall. Morning News, Inc., 209 F.3d 419, 428 (5th Cir. 2000).[8]

While Grey-Allen points to the decision by the Court of Appeals for the Ninth Circuit in Hashimoto v. Dalton, 118 F.3d 671 (9th Cir. 1997), where the court concluded that the plaintiff's visit to the Navy's Equal Employment Opportunity (EEO) counselor qualified as protected activity under the participation clause, id. at 680, Hashimoto is distinguishable from Grey-Allen's case.  The EEOC regulations in force at the time Hashimoto was decided required a federal employee to make a complaint to the EEO counselor within thirty days of the alleged discrimination as part of the required exhaustion of administrative remedies.  See id. at 678; 29 C.F.R.

---

[8] Several district courts in this Circuit have similarly concluded that participation in an internal investigation is not participation in a proceeding triggering the participation clause.  See, e.g., Correa, 550 F. Supp. 2d at 329; Bick v. City of New York, No. 95 Civ. 8781, 1997 WL 381801, at *4 (S.D.N.Y. July 10, 1997).

§ 1613.214(a)(1)(i) (1987). Thus, the complaint to the EEO counselor constituted participation in an investigation, proceeding, or hearing "under" Title VII, because the complaint was required by the EEOC regulations as a prerequisite to bringing a claim.[9]

The case law from other Courts of Appeals thus supports our conclusion that the plain language of the participation clause does not include participation in an internal employer investigation unrelated to a formal EEOC charge.

Grey-Allen relies on the decisions in Deravin v. Kerik, 335 F.3d 195 (2d Cir. 2003), and McMenemy v. City of Rochester, 241 F.3d 279 (2d Cir. 2001), but those decisions offer little support for her position. Deravin stands merely for the proposition that defending oneself in an EEOC investigation is protected activity under the participation clause; it sheds no light on whether participation in an internal employer investigation so qualifies. 335 F.3d at 204-05. While this Court held in McMenemy that a city

---

[9] The same was true in Kurtz v. McHugh, 423 F. App'x 572 (6th Cir. 2011), where the court found that the plaintiff engaged in protected activity under the participation clause by making a statement to the EEO counselor and otherwise participating in EEO proceedings. Id. at 578. The employee in that case was a federal employee and was thus required under the EEOC regulations to make a complaint to the EEO counselor within forty-five days of the discriminatory conduct in order to exhaust administrative remedies. See id. at 575-76; 29 C.F.R. § 1614.105(a)(1) (2010).

employee's internal investigation of sexual harassment allegations constituted protected activity, this Court analyzed the participation clause and opposition clause together and thus did not decide the independent question of whether participation in an internal employer investigation qualifies as protected activity under the participation clause. 241 F.3d at 283-85.

Grey-Allen also contends that the affirmative defense created by the Supreme Court in Faragher and Ellerth brings internal investigations "under" Title VII within the language of the participation clause. In Faragher and Ellerth, the Supreme Court established an affirmative defense to an employer's vicarious liability for a hostile work environment created by a supervisor of the plaintiff employee. To raise such a defense successfully, the employer must not have taken a tangible employment action against the plaintiff and must demonstrate: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765. While the Faragher/Ellerth affirmative defense creates an incentive for employers to conduct internal investigations

in order to show that they have met the first prong of this defense, it does not impose an obligation on employees to participate in such investigations as a necessary prerequisite to bringing a discrimination claim under Title VII.  See Total Sys. Servs., 221 F.3d at 1174 n.3 ("According to the EEOC, [Faragher and Ellerth] essentially made reporting an incident of harassment to the employer a new prerequisite to filing a claim.  We disagree with the EEOC's use of these important decisions. . . . We do not believe Congress intended to protect absolutely every sexual harassment complaint made to an employer . . . as a protected activity under the participation clause.").  Faragher and Ellerth do not provide a basis for bringing internal investigations not associated with a formal EEOC charge "under this subchapter" within the language of the participation clause.[10]

---

[10]  The EEOC has submitted an amicus brief urging us to adopt a contrary interpretation of the participation clause, one that embraces internal employer investigations.  The EEOC's views are entitled to deference to the extent they have the power to persuade.  See Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944) ("The weight of [an agency's] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."); N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health, 556 F.3d 114, 130-31 (2d Cir. 2003) (amicus brief from the Food and Drug Administration was subject to Skidmore deference).  However, for the reasons explained above, we do not find the EEOC's interpretation persuasive in this case.

Grey-Allen also argues more generally that, because internal investigations are integral to the deterrent aims and effective operation of Title VII, participation in such investigations should qualify as protected activity.  However, this cannot be squared with the plain language of the participation clause, which requires that the investigation in which the employee participates be "under" Title VII, not merely integral to effectuating its purposes.

We thus affirm the district court's grant of summary judgment dismissing Grey-Allen's Title VII retaliation claim.

B.

Because we affirm the district court's grant of summary judgment dismissing Grey-Allen's Title VII retaliation claim, we need not address the question of whether a reasonable jury could find that Grey-Allen was the victim of retaliation.

**II.**

BEI and the Benjamins raise a number of arguments on this appeal.  They first assert that the district court erred in denying their motion for judgment as a matter of law or, in the alternative, for a new trial.  Specifically, they claim that the district court committed the following errors:  (1) concluding that there is a "proxy" or "alter ego" exception to

-19-

the Faragher/Ellerth affirmative defense; (2) finding that a reasonable jury could conclude that Hugh Benjamin was a "proxy" or "alter ego" for BEI; (3) instructing the jury on proxy/alter ego liability; and (4) instructing the jury on Michelle Benjamin's individual liability.[11]

Second, BEI and the Benjamins argue that the district court abused its discretion in awarding Townsend $141,308.80 in attorney's fees and costs.

A.

BEI and the Benjamins argue that the district court erred in denying their motion for judgment as a matter of law or, in the alternative, for a new trial. We review a district court's denial of a motion for judgment as a matter of law de novo. See Parrot v. Guardian Life Ins. Co. of Am., 338 F.3d 140, 142 (2d Cir. 2003). "We will reverse the denial of judgment as a matter of law only if, notwithstanding making all credibility assessments and drawing all inferences in favor of [the non-moving party], a reasonable juror would be compelled to accept the view of [the moving party]." Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc., 290 F.3d 98, 109 (2d Cir. 2002) (internal quotation marks and citations

[11] BEI and the Benjamins also argue that, if the Faragher/Ellerth affirmative defense can be applied in this case, they established that defense as a matter of law.

-20-

omitted). We review a district court's denial of a motion for a new trial for abuse of discretion. See Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 15 (2d Cir. 2000). "A motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." Medforms, 290 F.3d at 106 (internal quotation marks and citations omitted).

1.

BEI and the Benjamins first argue that the district court erred in concluding that the doctrine of proxy/alter ego liability survives Faragher and Ellerth. They contend that the Faragher/Ellerth affirmative defense remains available even when the alleged harasser holds a sufficiently high position within the hierarchy of an organization to be considered the organization's proxy or alter ego. This is a question of first impression in this Court.

This argument cannot be squared with a fair reading of Faragher and Ellerth. In Faragher, the Supreme Court began by outlining its previous case law on the liability of employers in sexual harassment cases. 524 U.S. at 785-93. While noting that "our cases have established few definite rules for determining when an employer will be liable for a

-21-

discriminatory environment that is otherwise actionably abusive," id. at 788, the Court highlighted those areas of the law in which there was little ambiguity.

One such area was the doctrine of proxy/alter ego liability, which is related to, but distinct from, vicarious liability. The Court noted that it was "[not] exceptional that standards for binding the employer were not in issue in Harris [v. Forklift Systems, Inc., 510 U.S. 17 (1993)]," given that "the individual charged with creating the abusive atmosphere was the president of the corporate employer" and thus "was indisputably within that class of an employer organization's officials who may be treated as the organization's proxy." Id. at 789. The Court also cited this Court's decision in Torres v. Pisano, 116 F.3d 625 (2d Cir. 1997), for the proposition that "a supervisor may hold a sufficiently high position 'in the management hierarchy of the company for his actions to be imputed automatically to the employer.'" Faragher, 524 U.S. at 789-90 (citing and quoting Torres, 116 F.3d at 634-35 & n.11). This doctrine, as approvingly described by Faragher, thus holds an employer liable in its own right for wrongful harassing conduct, rather than vicariously liable for actions of the employer's agents.[12]

_____

[12] The Court in Faragher also relied upon the proxy/alter ego doctrine to explain its prior cases holding that liability for

Similarly, the Court in Ellerth invoked the alter ego doctrine in its discussion of employer liability principles and carefully distinguished the doctrine from the facts of the case before it. 524 U.S. at 758 ("Subsection [219(2)](a) [of the Restatement (Second) of Agency] addresses direct liability . . . and indirect liability, where the agent's high rank in the company makes him or her the employer's alter ego. None of the parties contend [the supervisor's] rank imputes liability under this principle. . . . So, for our purposes here, subsection[] (a) . . . can be put aside."). Ellerth instead derived the appropriate standard for non-proxy employer liability, and its two-part affirmative defense, from Section 219(2)(d) of the Restatement, which "concerns vicarious liability for intentional torts committed by an employee." Id. at 759; see also id. at 759-65.

Moreover, Faragher and Ellerth made clear that they did not intend to depart from these well-established theories of employer liability in sexual harassment cases. Indeed, Faragher explained that the Supreme Court had affirmed the

discriminatory employment actions with tangible results is to be imputed to employers. 524 U.S. at 790 ("A variety of reasons have been invoked for this apparently unanimous rule. Some courts explain, in a variation of the 'proxy' theory discussed above, that when a supervisor makes such decisions, he 'merges' with the employer, and his act becomes that of the employer." (emphasis added)).

relevance of agency principles in those cases in Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 (1986), and that "Meritor's statement of the law is the foundation on which we build today." 524 U.S. at 791-92. Thus, the Faragher/Ellerth affirmative defense builds upon rather than repudiates the theory of proxy/alter ego liability articulated in the Court's prior cases.

Every Court of Appeals to have considered this issue has held that the Faragher/Ellerth affirmative defense is unavailable when the supervisor in question is the employer's proxy or alter ego. See Ackel v. Nat'l Commc'ns, Inc., 339 F.3d 376, 383-84 (5th Cir. 2003) (holding that the Faragher/Ellerth defense is unavailable "when the harassing supervisor is . . . 'indisputably within that class of an employer organization's officials who may be treated as the organization's proxy'" (quoting Faragher, 524 U.S. at 789) (emphasis omitted)); Johnson v. West, 218 F.3d 725, 730 (7th Cir. 2000) (same); cf. Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d 493, 517 (9th Cir. 2000) (holding that the Faragher/Ellerth affirmative defense is "inapplicable as a defense to punitive damages when the corporate officers who engage in illegal conduct are

sufficiently senior to be considered proxies for the company").[13]

The EEOC's interpretation of Title VII, as set forth in its Enforcement Guidance, is in accord with this analysis. See EEOC Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors, 1999 WL 33305874, at *18 (June 18, 1999) ("[When the alleged harasser qualifies as the employer's proxy], the official's unlawful harassment is imputed automatically to the employer. Thus, the employer cannot raise the [Faragher/Ellerth] affirmative defense, even if the harassment did not result in a tangible employment action." (footnote omitted)). The EEOC's Enforcement Guidance is entitled to deference to the extent it has the power to persuade. See Skidmore, 323 U.S. at 140; Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110 n.6 (2002) (EEOC's interpretation contained in Compliance Manual subject to

---

[13] Other Courts of Appeals have continued to apply the proxy/alter ego doctrine after Faragher and Ellerth but have not ruled on whether proxy/alter ego liability bars an employer from raising the Faragher/Ellerth defense. See Helm v. Kansas, 656 F.3d 1277, 1286 (10th Cir. 2011) ("We have not squarely addressed whether an employer may rely on the Faragher/Ellerth defense when a victimized employee seeks to impose liability on the employer under the alter-ego theory . . . . We need not decide that issue to resolve this case, however, as we conclude that . . . Judge Stewart did not operate as the alter ego of the State."); Mallinson-Montague v. Pocrnick, 224 F.3d 1224, 1228 n.2, 1232-33 (10th Cir. 2000) (court did not address the issue because the plaintiff did not raise the question and the Faragher/Ellerth affirmative defense failed on the merits).

-25-

<u>Skidmore</u> deference); <u>Mack v. Otis Elevator Co.</u>, 326 F.3d 116, 127 (2d Cir. 2003) ("While we are not bound by [the EEOC's] enforcement guidelines, they are entitled to respect to the extent that they are persuasive."). For the reasons explained above, we find the EEOC's interpretation persuasive.

In sum, there was no error in the district court's conclusion that the <u>Faragher</u>/<u>Ellerth</u> defense is unavailable when the alleged harasser is the employer's proxy or alter ego and in the district court's denial of the defendants' post-trial motion on this basis.

2.

BEI and the Benjamins next argue that the jury could not reasonably have concluded that Hugh Benjamin was BEI's alter ego and that the district court thus erred in denying the defendants' motion for judgment as a matter of law on this basis. We disagree.

BEI and the Benjamins argue that no reasonable jury could find that BEI condoned Hugh Benjamin's harassment, given that BEI's President was Hugh Benjamin's wife. However, the relevant question is not whether the employer approved of the actions of the supervisor but rather whether the supervisor occupied a "sufficiently high position 'in the management hierarchy of the company for his actions to be imputed

automatically to the employer.'" Faragher, 524 U.S. at 789-90 (quoting Torres, 116 F.3d at 634); see also Ackel, 339 F.3d at 384 ("[T]he only factor relevant to the determination of whether [the supervisor in question] was a proxy for [the employer] is whether he held a 'sufficiently high position in the management hierarchy' so as to speak for the corporate employer." (quoting Faragher, 524 U.S. at 789)).

In this case, the jury reasonably could have concluded that Hugh Benjamin occupied such a position. Courts of Appeals have considered supervisors to be of sufficiently high rank to qualify as an employer's proxy or alter ego when the supervisor is "a president, owner, proprietor, partner, corporate officer," or otherwise highly-positioned in the management hierarchy. Johnson, 218 F.3d at 730; see also Helm, 656 F.3d at 1286 ("In Faragher, the Supreme Court suggested that presidents, owners, proprietors, partners, corporate officers, and supervisors with a high position in the management hierarchy are the types of officials who can be considered an organization's alter ego."); EEOC v. Karenkim, Inc., No. 08 Civ. 1019, 2010 WL 3810160, at *4-5 (N.D.N.Y. Sept. 22, 2010) (applying same standard). Here, Hugh Benjamin is the only corporate Vice President of BEI, operating as second-in-command, with a position immediately below Michelle Benjamin in the corporate hierarchy. He is also a corporate

-27-

shareholder with a financial stake in BEI. All of BEI's corporate shares are held by Hugh Benjamin, Michelle Benjamin, and their two children. Given these facts, the jury reasonably could have concluded that Hugh Benjamin was sufficiently high within the corporate hierarchy to qualify as BEI's alter ego. See Ackel, 339 F.3d at 384 (finding a triable issue of fact with respect to whether supervisor was a proxy for the corporation when he was President and General Manager of the company and a stockholder and member of the Board of Directors with managerial duties); Mallinson-Montague, 224 F.3d at 1232-33 (holding that alter ego instruction was appropriate based on the supervisor's high managerial rank as Senior Vice President of Consumer Lending and his supervisory duties).

Moreover, Hugh Benjamin exercised a significant degree of control over corporate affairs, which is consistent with alter ego liability. He collaborated with Michelle Benjamin on corporate decisions including hiring, and the supervisors and managers in the field reported directly to him. See Mallinson-Montague, 224 F.3d at 1233 (finding persuasive that Senior Vice President of Consumer Lending "had the authority to hire and fire employees in [his] department" and "was the ultimate supervisor of all employees in [his] department"). While Michelle Benjamin had the power to overrule Hugh

Benjamin's decisions, this fact alone, without more evidence of pervasive control over Hugh Benjamin by other corporate officers at BEI, is not sufficient to establish as a matter of law that Hugh Benjamin was not BEI's alter ego. Compare id. at 1233 (holding that an alter ego instruction was appropriate when supervisor in question answered only to the company's president), with Johnson, 218 F.3d at 730 (holding that a supervisor could not be considered employer's proxy/alter ego when he had at least two levels of supervisors and likely others within the organization's bureaucracy). Nor does the fact that Hugh Benjamin owned only 5% of the corporate stock at the time of trial conclusively establish that he is not BEI's alter ego. "Stock ownership is not a prerequisite for acting as a corporation's proxy," Ackel, 339 F.3d at 384; moreover, Hugh Benjamin owned 34% of the corporate shares until 2004, when some of the shares were transferred to the Benjamins' children for estate planning purposes, a transfer that did not affect Hugh Benjamin's decisionmaking authority. Thus, because Hugh Benjamin occupied a high managerial rank within BEI and because he exercised significant control over the company's operations, the jury reasonably could have concluded that he was BEI's alter ego. The district court therefore did not err in denying the defendants' motion for judgment as a matter of law on this basis.

BEI and the Benjamins also argue that the district court's jury instruction on alter ego liability was erroneous and that the district court abused its discretion in denying the defendants' motion for a new trial on this basis.  We will grant a new trial if the jury instruction was erroneous and if that error was not harmless.  <u>Sanders v. N.Y.C. Human Res. Admin.</u>, 361 F.3d 749, 758 (2d Cir. 2004).  "[A] jury charge is erroneous if the instruction misleads the jury as to the proper legal standard, or it does not adequately inform the jury of the law."  <u>Luciano v. Olsten Corp.</u>, 110 F.3d 210, 218 (2d Cir. 1997).

The district court's jury instruction on alter ego liability provided in relevant part that:

> Under both federal and state law, an employer is strictly liable for hostile work environment sexual harassment by a supervisor when the supervisor's role is more than a mere supervisor and is actually identical to that of the employer.
>
> In other words, where an employee serves in a supervisory position and exercises significant control over an employee's hiring, firing or conditions of employment, that individual operates as the alter ego of the employer, and the employer is strictly liable for any unlawful employment practices of the individual without regard to whether the employer knew of the individual's conduct.
>
> Therefore, . . . you must determine whether, under all of the circumstances, [Hugh Benjamin] served in a supervisory position and exercised significant control

over an employee's hiring, firing or conditions of employment.

If you determine that Hugh Benjamin was employed in a position sufficiently elevated within the corporate hierarchy as to be viewed as the employer's alter ego, then you must also find Defendant Benjamin Enterprises strictly liable for hostile work environment sexual harassment under both federal and state law, and Defendant Michelle Benjamin strictly liable for hostile work environment sexual harassment under New York State law.

On the other hand, if you determine from all of the circumstances that Hugh Benjamin's role in the corporation was not sufficiently elevated within the corporate hierarchy to be considered the employer's alter ego, then the employer's liability is not automatic . . . .

BEI and the Benjamins contend that the jury instruction was erroneous because it suggested to the jury that an individual could be an employer's alter ego merely because that individual "serves in a supervisory position and exercises significant control over an employee's hiring, firing or conditions of employment." They argue that alter ego liability is not so broad as to encompass such a wide range of individuals. We agree.

The jury instruction was erroneous because it gave the jury a misleading impression of the proper standard for alter ego liability. Specifically, the instruction twice stated that an individual qualifies as the alter ego of an employer where that individual "serve[s] in a supervisory position and

exercise[s] significant control over an employee's hiring, firing or conditions of employment." However, an individual's mere status as a supervisor with power to hire or fire is not sufficient to render that individual an alter ego of an employer. See Faragher, 524 U.S. at 792 ("Title VII does not make employers 'always automatically liable for sexual harassment by their supervisors . . . .'" (quoting Meritor, 477 U.S. at 72)); Mallinson-Montague, 224 F.3d at 1233 (finding that "the district court erred in concluding that the alter ego instruction was appropriate simply because [the defendant] was the Plaintiffs' supervisor and exercised a high degree of control over them").[14]

It is true, as Townsend argues, that other portions of the jury instruction ameliorated this error to some extent by stating that "the supervisor's role [must be] more than a mere supervisor" and by directing the jury to consider whether "Hugh Benjamin was employed in a position sufficiently elevated within the corporate hierarchy as to be viewed as the employer's alter ego." However, we cannot conclude that these portions of the charge were sufficient to correct the misleading impression created by the other erroneous statements. Given that the jury instruction twice stated that

---

[14] Indeed, counsel for both parties objected to this language in the proposed jury instruction.

an individual qualifies as an alter ego where he or she "serve[s] in a supervisory position and exercise[s] significant control over an employee's hiring, firing or conditions of employment," the jury could have been left with the erroneous impression that a supervisor in this position is, by definition, "sufficiently elevated within the corporate hierarchy" for alter ego liability to attach.

However, the error in the instruction was harmless. "An error is harmless only when we are persuaded it 'did not influence the jury's verdict.'" Sanders, 361 F.3d at 758 (quoting Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000)). We are persuaded that the error here did not influence the jury's finding with respect to alter ego liability because no reasonable juror could have concluded that Hugh Benjamin was not the alter ego of BEI. Hugh Benjamin was extremely elevated in the corporate hierarchy of BEI, serving as the only corporate Vice President, second only to Michelle Benjamin, BEI's President. As a senior corporate officer, he answered only to Michelle Benjamin and exercised managerial responsibility for day-to-day operations of BEI. He was also a corporate shareholder with a financial stake in BEI. Given Hugh Benjamin's extremely high rank within BEI and his significant control over the company's operations, we are persuaded that any error in the district court's jury

-33-

instruction did not influence the jury's finding with respect to alter ego liability and was therefore harmless.

Accordingly, we affirm the district court's denial of the defendants' post-trial motion on this basis.

4.

We have found that the district court correctly concluded (1) that the Faragher/Ellerth defense is unavailable when the supervisor in question is the employer's proxy or alter ego; (2) that the jury reasonably could have concluded that Hugh Benjamin was BEI's alter ego; and (3) that there was no prejudicial error in the jury instruction on alter ego liability.  Because BEI was thus properly precluded from raising the Faragher/Ellerth defense in the proceedings below, the argument by BEI and the Benjamins that the Faragher/Ellerth defense was proven in this case as a matter of law is moot.

5.

BEI and the Benjamins next claim error in the district court's instruction regarding individual liability for Michelle Benjamin under the New York Human Rights Law.  The jury instruction provided in relevant part that:

-34-

> If you determine that Hugh Benjamin was employed in a position sufficiently elevated within the corporate hierarchy as to be viewed as the employer's alter ego, then you must also find Defendant Benjamin Enterprises strictly liable for hostile work environment sexual harassment under both federal and state law, and Defendant Michelle Benjamin strictly liable for hostile work environment sexual harassment under New York State law.

BEI and the Benjamins do not dispute that the jury instruction correctly states the law on employer liability under § 296(1) of the New York Human Rights Law.  Under this provision, an individual is properly subject to liability for discrimination when that individual qualifies as an "employer."  N.Y. Exec. Law § 296(1).  An individual qualifies as an "employer" when that individual has an ownership interest in the relevant organization or the "power to do more than carry out personnel decisions made by others."  Patrowich v. Chem. Bank, 473 N.E.2d 11, 12 (N.Y. 1984) (per curiam).  The jury instruction accurately reflects these principles.  Because there was no dispute that Michelle Benjamin had an ownership interest in the company and the power to hire and fire employees, it was proper for the district court to instruct the jury that, as a matter of law, it must find Michelle Benjamin strictly liable upon a finding that Hugh Benjamin qualified as BEI's alter ego.

-35-

BEI and the Benjamins nonetheless contend that the jury instruction was unfair because the claims against Michelle Benjamin had been premised on a theory of aiding and abetting liability under § 296(6) of the New York Human Rights Law rather than a theory of employer liability under § 296(1). However, this assertion does not demonstrate that the jury instruction was incorrect as a statement of the legal principles applicable to § 296(1). Nor does it matter that the original complaint premised its claims against Michelle Benjamin on § 296(6). "The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters." Albert v. Carovano, 851 F.2d 561, 571 n.3 (2d Cir. 1988) (en banc); see also Flickinger v. Harold C. Brown & Co., 947 F.2d 595, 600 (2d Cir. 1991) (directing the entry of judgment for plaintiff on a legal theory not pleaded in the complaint). Moreover, BEI and the Benjamins have not shown that they were prejudiced in any way by the fact that this theory of liability was not raised earlier. The defendants had notice of the proposed jury charge and an opportunity to object to it prior to summations. They do not assert that they would have conducted their defense any differently had the original complaint alleged employer liability under § 296(1), perhaps because they do not dispute that Michelle

Benjamin plainly qualifies as an employer under this provision.[15] Thus, the district court's jury instruction on Michelle Benjamin's individual liability was not erroneous.

B.

BEI and the Benjamins next argue that the district court's award of attorney's fees was an abuse of discretion. "Our review of an award of attorneys' fees is 'highly deferential to the district court'" and we will reverse such an award only for an abuse of discretion. Crescent Publ'g Grp., Inc. v. Playboy Enters., Inc., 246 F.3d 142, 146 (2d Cir. 2001) (quoting Alderman v. Pan Am World Airways, 169 F.3d 99, 102 (2d Cir. 1999)).

Under Title VII, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee . . . as part of the costs." 42 U.S.C. § 2000e-5(k). In this case, the district court awarded attorney's fees and costs to Townsend in the amount of $141,308.80. This award included fees and costs accrued both before and after the defendants made an Offer of Judgment pursuant to Rule 68 ("Rule 68 Offer") in the amount of $50,000. BEI and the Benjamins

---

[15] At oral argument, counsel for BEI and the Benjamins conceded that "[i]f there were a pleading that [Michelle Benjamin] were the employer then [the district court] would have been right" to give the instruction at issue here. (Tr. 40).

contend that the plaintiff is not entitled to fees and costs accrued after the defendants' Rule 68 Offer.

Rule 68 provides in relevant part that:

> [A] party defending against a claim may serve on an opposing party an offer to allow judgment on specified terms, with the costs then accrued. . . . If the judgment that the offeree finally obtains is not more favorable than the unaccepted offer, the offeree must pay the costs incurred after the offer was made.

Fed. R. Civ. P. 68. Thus, a prevailing plaintiff may not recover from the defendant attorney's fees and costs accrued after an Offer of Judgment is served if the Offer exceeds the sum of the plaintiff's ultimate recovery plus the amount of fees and costs accrued by the plaintiff as of the time of the Offer. See Marek v. Chesny, 473 U.S. 1, 11-12 (1985); Reiter v. MTA N.Y.C. Transit Auth., 457 F.3d 224, 229 (2d Cir. 2006). Here, the district court concluded that the $50,000 Rule 68 Offer did not exceed the sum of the $30,400 jury verdict and the fees and costs accrued as of the date of the Rule 68 Offer. The district court determined that the plaintiff was therefore entitled to recover reasonable fees and costs, including those accrued after the Rule 68 Offer.

To determine pre-Offer attorney's fees, the district court applied the familiar method of deriving reasonable hourly rates for attorney and paralegal services from the prevailing market rate for counsel of similar experience and

skill in the district, and multiplying these respective rates by the number of hours reasonably expended by attorneys and paralegals prior to the Rule 68 Offer.[16] BEI and the Benjamins contend that the district court erred in arriving at an attorney hourly rate of $350 based on prevailing market rates, rather than a rate of $250 based on Townsend's retainer agreement with counsel. That retainer agreement provided that Townsend would pay to her attorneys various amounts depending on whether the case settled or went to trial. One measure was that Townsend would pay to her attorneys 30% of any pre-trial settlement or $250 per hour, whichever was greater. The parties agree that, had the rate of $250 been used, the Rule 68 Offer would have exceeded the sum of the plaintiff's ultimate recovery plus pre-Offer fees and costs.

The district court did not err in declining to use the retainer rate as the basis for calculating the reasonable hourly rate. In Blanchard v. Bergeron, 489 U.S. 87 (1989), the Supreme Court made clear that, in determining a reasonable hourly rate for an attorney's services, the amount set forth

---

[16] The district court determined the reasonable hourly rate for attorneys' services to be $350 and the reasonable rate for the paralegal to be $100. Multiplying these respective figures by the reasonable hours expended, and adding $308.50 in pre-Offer costs, the district court arrived at a total of $25,963.50. The sum of this figure and the $30,400 jury award was $56,363.50, more than the $50,000 Rule 68 Offer.

-39-

in a contingent fee retainer agreement is not dispositive.

_Id._ at 93. The Court explained that:

> [A]s we see it, a contingent-fee contract does not impose an automatic ceiling on an award of attorney's fees . . . . As we understand § 1988's provision for allowing a 'reasonable attorney's fee,' it contemplates reasonable compensation, in light of all of the circumstances, for the time and effort expended by the attorney for the prevailing plaintiff, no more and no less. Should a fee agreement provide less than a reasonable fee calculated in this manner, the defendant should nevertheless be required to pay the higher amount.

_Id.; see also_ _Reiter_, 457 F.3d at 232-33 (holding that the market rate rather than the retainer agreement rate was the best measure of the reasonable hourly rate when the retainer agreement rate was discounted for the plaintiff in a civil rights case). Indeed, this Court has instructed that determination of a reasonable hourly rate "contemplates a case-specific inquiry into the prevailing market rates for counsel of similar experience and skill to the fee applicant's counsel," an inquiry that may "include judicial notice of the rates awarded in prior cases and the court's own familiarity with the rates prevailing in the district." _Farbotko v. Clinton Cnty._, 433 F.3d 204, 209 (2d Cir. 2005).

The district court, relying on _Farbotko_, conducted just such a case-specific inquiry here. The court examined the hourly rates awarded to civil litigators in similar firms in the district, concluding that they ranged from $225 to $375

per hour.  The court also noted that one of Townsend's attorneys had been awarded $310 per hour in another case in the Southern District of New York two years before the fee award in this case.  The court declined to rely on an affidavit from an attorney in another law firm attesting that rates charged by attorneys in her firm ranged from $675-900, reasoning that this attorney's firm was much larger in size than Townsend's attorneys' firm and thus not an accurate comparator for assessing hourly rates in the district.  The court also noted its "familiarity with prevailing rates in this district for attorneys of similar skill, reputation and experience at small firms engaged in civil rights litigation." Based on all these factors, the court concluded that a reasonable hourly rate for Townsend's attorneys was $350, rather than the $375 they had requested.  The district court thus clearly conducted a careful analysis of comparable hourly rates in the district.  The rate of $350 was wholly reasonable and was not an abuse of discretion.[17]  Using this rate, the

[17] It is important to note that the relevant time period in relation to which the prevailing market rate should be calculated, for purposes of assessing whether a plaintiff is entitled to post-Offer fees and costs, is the time at which the Rule 68 Offer was served on the plaintiff (here 2006), rather than the time at which the attorney's fee application was made (here 2009).  There is no indication that the district court's analysis was erroneous in this respect.  In examining the rates awarded to other civil litigators in the district, the court cited awards that took place between 2005

amount of pre-Offer fees and costs, in combination with the plaintiff's ultimate recovery, exceeds the Rule 68 Offer. Thus, the district court was correct to award fees and costs incurred both before and after the Rule 68 Offer.

BEI and the Benjamins also argue that the district court should have adjusted the pre-Offer fee award downward for lack of success because of the allegedly low amount of the jury verdict. However, "[a] presumptively correct 'lodestar' figure should not be reduced simply because a plaintiff recovered a low damage award." Cowan v. Prudential Ins. Co. of Am., 935 F.2d 522, 526 (2d Cir. 1991); see also Kassim v. City of Schenectady, 415 F.3d 246, 252 (2d Cir. 2005) ("[W]e have repeatedly rejected the notion that a fee may be reduced merely because the fee would be disproportionate to the financial interest at stake in the litigation."). Moreover, the district court carefully analyzed the hours for which compensation was sought, reducing those it deemed excessive, and also applied an across-the-board reduction of 15% to the post-Rule 68 Offer fees to reflect the lack of success on Townsend's constructive discharge claim and to account for some excessiveness in the fee application. It was well within

and 2008 and also noted an award to one of Townsend's attorneys in 2007. These are not so far in time from the 2006 Rule 68 Offer to suggest that the district court's analysis was erroneous.

the district court's discretion to refuse to apply a further downward adjustment to the pre-Offer fee award.

We thus affirm the district court's attorney's fee award in its entirety.

**CONCLUSION**

We have considered all of the arguments of the parties. To the extent not specifically addressed above, they are either moot or without merit.  For the reasons explained above, we **affirm** the judgment of the district court.

LOHIER, Circuit Judge, concurring:

I agree completely with the majority opinion relating to Townsend. I also reluctantly concur in its decision to affirm the dismissal of Grey-Allen's claim under Title VII of the Civil Rights Act of 1964. I write separately to explain that affirming requires reference to the legislative history of Title VII's antiretaliation provision because the text is ambiguous. I also write to suggest that Congress should act to clarify Title VII if it desires to prohibit private employers from retaliating against employees merely because they participate in internal investigations of discrimination complaints prior to any involvement by the EEOC.

Title VII's antiretaliation provision, section 704(a), has two distinct clauses forbidding retaliation against employees engaged in protected activity: the opposition clause and the participation clause. The opposition clause makes it "unlawful . . . for an employer to discriminate against any . . . employee[] . . . because he has opposed any practice made unlawful . . . by this subchapter," while the participation clause makes it unlawful for an employer to discriminate against any employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

Although there may be some question about whether Grey-Allen "opposed" any unlawful employment practice (a question to which I turn below), she accused her employer of violating only the participation clause. Similarly, on appeal, Grey-Allen's employer relied solely on its assertion that the participation clause does not apply to internal investigations. There was strong evidence that it fired Grey-Allen for no reason other than that she conducted an effective internal investigation of a sexual harassment claim against a corporate vice-president. I begin, therefore,

1

with the following question: Does the participation clause allow a private employer to fire a human resources director or EEO officer because she conducted a neutral investigation of an employee's discrimination claim without involving the EEOC?

Congress has never directly confronted the issue of whether private-sector employees who undertake these important investigations are protected from retaliation under the participation clause. The Supreme Court explicitly left open the question of whether the participation clause protects these employees in Crawford v. Metropolitan Government of Nashville & Davidson County, Tennessee, 555 U.S. 271 (2009), even as it answered a similar question in the context of the opposition clause. Ultimately, the statutory text and legislative history of Title VII persuade me that the majority opinion correctly resolved this question in favor of the employer in this case, although I arrive at that conclusion using a different route.

I start with the text of the statute. I agree with my colleagues that the phrase "investigation . . . under this subchapter" clearly includes EEOC investigations. I disagree, however, that the phrase, which should be interpreted broadly, unambiguously excludes internal investigations conducted by employers. See EEOC v. Total Sys. Servs., Inc., 240 F.3d 899, 901 (11th Cir. 2001) (dissent from denial of rehearing in banc). First, certain provisions of Title VII – the "subchapter" to which the clause refers[1] – suggest a role for non-governmental enforcement of the statute. For example, section 705(g)(1) of Title VII authorizes the EEOC to "cooperate with and . . . utilize regional, State, local, and other agencies, both public and private, and individuals." 42 U.S.C. § 2000e-4(g)(1). Second, other provisions of Title VII expressly limit

---

[1] Title VII is codified as Subchapter VI of Chapter 21 of Title 42 of the United States Code.

2

the term "investigation" to an investigation by the EEOC, indicating that Congress clearly could and did refer solely to EEOC investigations when it intended to do so. See id. § 2000e-5(b) (referring to "investigation by [the] Commission"); id. § 2000e-8(a) (referring to "any investigation of a charge filed under [the EEOC's enforcement provision] of this title [section 706]"); id. § 2000e-9 (referring to "investigations conducted by the Commission or its duly authorized agents or agencies"). As a result, I conclude that the phrase "investigation . . . under this subchapter" is ambiguous, and I proceed to the legislative history to determine what Congress meant by it. See SEC v. Rosenthal, 650 F.3d 156, 161 (2d Cir. 2011).

Congress appears to have had only government investigations in mind in 1964. There is no indication in the legislative history of Title VII that Congress meant to include internal investigations by private employers in the participation clause. I recognize that "when it originally enacted Title VII, Congress hoped to encourage employers to comply voluntarily with the act," EEOC v. Shell Oil Co., 466 U.S. 54, 77 (1984), but Congress does not appear to have embraced internal investigations as a way to do so. It did not once mention internal investigations by private employers in the debates and speeches leading up to the enactment of Title VII or in subsequent major amendments to the statute. This is not surprising since, as the EEOC acknowledged at oral argument, it appears that "there really weren't" such investigations prior to 1964. Tr. of Oral Arg. at 17:11-19. They also appear not to have been among Congress's concerns in subsequent major amendments to Title VII in 1972, 1978 and 1991. Instead, it seems that Congress focused on protecting employees who participated in EEOC

3

investigations, other federal-sector investigations,[2] or analogous state-sponsored investigations. Without evidence that private-sector internal investigations existed and that Congress considered them at the time it enacted Title VII, I am hard pressed to conclude from the legislative history that Congress intended to include these investigations in the ambit of the participation clause.

Even the EEOC's interpretation of the participation clause, as reflected in its Compliance Manual, is of little help to Grey-Allen. While not entitled to full deference under <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984), the manual and other EEOC directives nevertheless "reflect a 'body of experience and informed judgment to which courts and litigants may properly resort for guidance,'" and are "entitled to a 'measure of respect' under the less deferential <u>Skidmore</u> standard." <u>Fed. Express Corp. v. Holowecki</u>, 552 U.S. 389, 399 (2008); <u>see also</u> <u>Crawford</u>, 555 U.S. at 276. Although the EEOC argued as amicus

---

[2] As originally enacted in 1964, Title VII did not apply to federal employees. "Instead, employment discrimination claims brought by federal employees were governed by Executive Orders and agency regulations. In general, a federal agency accused of discrimination would investigate the claim, conduct a hearing and render a final decision . . . ." <u>Pueschel v. United States</u>, 369 F.3d 345, 352 (4th Cir. 2004). As Congress was surely well aware in 1964, federal regulations in place pursuant to Executive Order No. 10590, 20 Fed. Reg. 409 (Jan. 19, 1955), directed the heads of each federal department or agency to designate an Employment Policy Officer (later changed to an Equal Employment Opportunity, or "EEO," Officer), who was required to conduct prompt internal "investigation[s] of each complaint" "of alleged discrimination in personnel matters within his department or agency." 5 C.F.R. §§ 1401.4, 1401.17 (1964); <u>see</u> 5 C.F.R. § 713.204(d)(4) (1968) (designating EEO Officers to investigate complaints within federal agencies). These internal federal agency investigations continued after Congress amended Title VII by passing the Equal Employment Opportunity Act of 1972 (the "EEOA") to extend its coverage to most federal employees. <u>See</u> 42 U.S.C. § 2000e-16; 117 Cong. Rec. 32,105 (1971); S. Rep. No. 92-415, at 14 (1971), <u>reprinted in</u> Senate Subcommittee on Labor of the Committee on Labor and Public Welfare, <u>Legislative History of the Equal Employment Opportunity Act of 1972</u>, at 423 (1972) ("Under present procedures, in most cases, each [federal] agency is still responsible for investigating . . . itself."). For these reasons, the phrase "investigation . . . under this subchapter" appears to include internal investigations of discrimination conducted by federal agencies through EEO Officers.

4

on appeal that it has long regarded internal investigations as covered by the participation clause, see Br. of EEOC as Amicus Curiae in Supp. of Appellant Grey-Allen 19, the EEOC's Compliance Manual does not state that the participation clause covers activity undertaken in the course of an internal investigation by an employer. The manual's guidance about whether an individual is protected under the participation clause does not mention internal investigations, referring instead to "individuals [who] challeng[e] employment discrimination under the statutes enforced by EEOC in EEOC proceedings, in state administrative or court proceedings, as well as in federal court proceedings, and to individuals who testify or otherwise participate in such proceedings." 2 EEOC Compliance Manual § 8-II-C, p. 614.0005 (May 1998); see id. § 2-II-A, p. 605.0005 (2008) (referring the reader to the 1998 EEOC Compliance Manual for more detailed guidance on protected activity).[3] To be sure, the manual states that "[p]rotected activity [under section 704(a)] . . . includes . . . presenting evidence as part of an internal investigation pertaining to an alleged EEO violation." Id. § 2-II-A, p. 605.0005. But it justifies its interpretation by reference to the opposition clause rather than the participation clause. See id. n.41.

[3] In contrast to the current manual, which does not state that cooperating with internal investigations is protected by the participation clause, an archived page of the EEOC's website cites "[c]ooperating with an internal investigation of alleged discriminatory practices" as an example of protected activity under the participation clause. Retaliation, http://archive.eeoc.gov/types/retaliation.html (last modified Mar. 11, 2009). Of course, the EEOC, like any other agency, is entitled to change its mind and change course. But the argument that it advances in its amicus brief (an argument that accords with the March 2009 archived website page referenced above) differs from its published, official interpretation of the participation clause, and it offers no support for its assertion that it has long adopted a more expansive interpretation of the participation clause. In the absence of a reasoned analysis explaining why its position differs from that set out in the Compliance Manual, the EEOC's new argument is "'entitled to considerably less deference' than a consistently held agency view." Am. Fed'n of State, Cnty. & Mun. Emps. v. Am. Int'l Grp., Inc., 462 F.3d 121, 129 (2d Cir. 2006) (quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 515 (1994)).

5

For these reasons, I am compelled to agree with the decision to affirm the judgment of the District Court. As a policy matter, however, the distinction between investigations in which the government is involved and internal investigations strikes me as antiquated and arbitrary. The facts of this case starkly illustrate the arbitrariness. Had Grey-Allen conducted her investigation under the auspices of a government agency such as the EEOC, her actions would have been protected under the participation clause. But because she conducted the same internal investigation without EEOC involvement, her actions are not protected.

Changes in the last decade to the enforcement and interpretation of Title VII underscore the wisdom of eliminating this distinction and protecting employees who participate in private-sector internal investigations. In particular, Faragher v. Boca Raton, 524 U.S. 775 (1998), and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998), represent a significant shift in the Title VII landscape, and the changes wrought by both cases are now woven into governmental and corporate equal employment opportunity practices. Internal investigations form an integral part of Title VII today, with or without the formal involvement of the EEOC – so much so that the Supreme Court has interpreted Title VII broadly to avoid "undermin[ing] the Ellerth-Faragher scheme, along with the statute's 'primary objective' of 'avoid[ing] harm' to employees." Crawford, 555 U.S. at 279 (emphasis added) (quoting Faragher, 524 U.S. at 806).

I recognize that the conclusion that the majority and I draw from the text, legislative history, and agency interpretations of Title VII is in tension with these recent developments and with the principle that, when reviewing Title VII, we should broadly interpret the phrase "under this subchapter." See Thompson v. N. Am. Stainless, LP, 131 S. Ct. 863, 868 (2011) ("Title VII's antiretaliation provision must be construed to cover a broad range of employer conduct."). But it is up to Congress, now accustomed to the centrality of internal investigations in the

employment context as a result of these developments, to consider the issue. Congress is best placed to fill this statutory gap between the text and history of the participation clause on the one hand, and Title VII's broad antiretaliation goals on the other hand. It may decide to do so by clarifying that the participation clause prohibits private employers from firing their human resources directors and EEO officers simply because they have conducted an internal investigation of, say, a sexual harassment complaint.

I have two final observations. First, in agreeing that Grey-Allen was not protected from retaliation under the participation clause as Congress conceived it in 1964, the majority and I take some solace in the possibility that, after Crawford, employees in Grey-Allen's position will be protected by the opposition clause. That remains to be decided; whether a human resources director who neutrally investigates a claim of discrimination nevertheless can be said to "oppose" a discriminatory practice is an open question in this Circuit. Second, when Congress enacted Title VII, it was aware of the existence of state agencies like the New York State Division of Human Rights ("NYSDHR"), and it authorized the newly created EEOC "to cooperate with and . . . utilize regional, State, local, and other agencies." 42 U.S.C. § 2000e-4(g)(1); see United States Equal Employment Opportunity Commission, Legislative History of Titles VII and XI of Civil Rights Act of 1964, 3044-45 (1968) (interpretative memorandum introduced into congressional record by Senators Clark and Case, the Senate floor managers for Title VII). Moreover, it contemplated that the EEOC and, by extension, analogous state agencies would provide "technical assistance" to employers who requested it to "further their compliance with" Title VII. 42 U.S.C. § 2000e-4(g)(3). In this case, Grey-Allen sought and received advice from the NYSDHR on proceeding with the sexual harassment investigation. In my view, involving a state agency such as the NYSDHR was enough to transform the internal

7

investigation into an "investigation . . . under this subchapter." 42 U.S.C. § 2000e-3(a). The majority opinion does not suggest anything to the contrary. Grey-Allen, however, never advanced this argument before the District Court, and she therefore forfeited it. See Local 377, RWDSU, UFCW v. 1864 Tenants Ass'n, 533 F.3d 98, 99 (2d Cir. 2008) (finding an argument not raised before the district court forfeited on appeal); Tr. of Oral Arg. at 5:6-24, 8:12-20, 21:12-22:3. Even with these two possible forms of protection, however, Congress should clarify whether the kind of investigation Grey-Allen conducted falls within the protective sweep of the participation clause.